# WEEMS *v.* UNITED STATES.

ERROR TO THE SUPREME COURT OF THE PHILIPPINE ISLANDS.

No. 20.   Argued November 30, December 1, 1909.—Decided May 2, 1910.

A paramount governmental authority may make use of subordinate governmental instruments, without the creation of a distinct legal entity as is the case of the United States and the United States Government of the Philippine Islands.

Under the Philippine Criminal Code of Procedure a public offense need not necessarily be described in the information in exact words of the statute but only in ordinary and concise language, so as to enable a person of common understanding to understand the charge and the court to pronounce judgment.

A charge describing the accused as a public official of the United States Government of the Philippine Islands and his offense as falsifying a public and official document in this case held sufficient. *Carrington* v. *United States*, 208 U. S. 1, distinguished.

The provision in Rule 35 that this court may at its option notice a plain error not assigned, is not a rigid rule controlled by precedent but confers a discretion exercisable at any time, regardless of what may have been done at other times; the court has less reluctance to disregard prior examples in criminal, than in civil, cases; and will act under the Rule when rights constitutional in nature or secured under a bill of rights are asserted.

Although not raised in the courts below, this court will, under Rule 35, consider an assignment of error made for the first time in this court that a sentence is cruel and unusual within the meaning of the Eighth Amendment to the Constitution or of the similar provision in the Philippine bill of rights.

In interpreting the Eighth Amendment it will be regarded as a precept of justice that punishment for crime should be graduated and proportioned to the offense.

A provision of the Philippine bill of rights taken from the Constitution of the United States must have the same meaning, and so held that the provision prohibiting cruel and unusual punishments must be interpreted as the Eighth Amendment has been.

What constitutes a cruel and unusual punishment prohibited by the Eighth Amendment has not been exactly defined and no case has heretofore occurred in this court calling for an exhaustive definition.

While legislation, both statutory and constitutional, is enacted to
remedy existing evils, its general language is not necessarily so con-
fined and it may be capable of wider application than to the mischief
giving it birth.

The Eighth Amendment is progressive and does not prohibit merely
the cruel and unusual punishments known in 1689 and 1787, but
may acquire wider meaning as public opinion becomes enlightened
by humane justice, and a similar provision in the Philippine bill of
rights applies to long continued imprisonment with accessories dis-
proportionate to the offense.

While the judiciary may not oppose its power to that of the legislature
in defining crimes and their punishment as to expediency, it is the
duty of the judiciary to determine whether the legislature has con-
travened a constitutional prohibition and in that respect and for
that purpose the power of the judiciary is superior to that of the
legislature.

It is within the power of this court to declare a statute of the Penal
Code defining a crime and fixing its punishment void as violative of
the provision in the Philippine bill of rights prohibiting cruel and
unusual punishment.

In determining whether a punishment is cruel and unusual as fixed
by the Philippine Commission, this court will consider the punish-
ment of the same or similar crimes in other parts of the United States,
as exhibiting the difference between power unrestrained and that
exercised under the spirit of constitutional limitations formed to
establish justice.

Where the statute unites all the penalties the court cannot separate
them even if separable, unless it is clear that the union was not made
imperative by the legislature; and in this case held that the penalties
of *cadena temporal,* principal and accessories, under art. 56 of the
Penal Code of the Philippine Islands are not independent of each
other,

Where the minimum sentence which the court might impose is cruel
and unusual within the prohibition of a bill of rights, the fault is in
the law and not in the sentence, and if there is no other law under
which sentence can be imposed it is the duty of the court to declare
the law void.

Where sentence cannot be imposed under any law except that declared
unconstitutional or void the case cannot be remanded for new sen-
tence but the judgment must be reversed with directions to dismiss
the proceedings.

In this case the court declared § 56 of the Penal Code of the Philippine

Islands and a sentence pronounced thereunder, void as violating the provision in the Philippine bill of rights contained in § 5 of the act of July 1, 1902, c. 1369, 32 Stat. 691, against the imposition of excessive fines and the infliction of cruel and unusual punishment, in so far as being prescribed for an offense by an officer of the Government of making false entries in public records as to payments of 616 pesos; the punishment being a fine of 4,000 pesos, and *cadena temporal* of over twelve years with accessories, such accessories including the carrying of chains, deprivation of civil rights during imprisonment and thereafter perpetual disqualification to enjoy political rights, hold office, etc., and subjection besides to surveillance.

The history of the adoption of the Eighth Amendment to the Constitution of the United States and cases involving constitutional prohibitions against excessive fines and cruel and unusual punishment reviewed and discussed in the opinion of the court and the dissenting opinion.

THE facts, which involve the legality of § 56 of the Penal Code of the Philippine Islands, and a sentence thereunder, under the guarantees against cruel and unusual punishments of the bill of rights of the Philippine Islands as expressed in the act of July 1, 1902, are stated in the opinion.

*Mr. A. S. Worthington* for plaintiff in error:

If Weems was a public official of any Government, it was the government of the Philippine Islands, and not the United States Government. See acts of March 8, 1902, 32 Stat. 54; July 1, 1902, 32 Stat. 691, in which in a great variety of ways they distinguish between the Government of the United States and the government of the Philippine Islands, especially in §§ 4, 53, 67, 71, 74 and 76–83.

The same distinction is maintained in the Coinage Act of March 2, 1903, 32 Stat. 952; and in the legislation of the island government. See §§ 3395, 3399, 3402, 1366 and 2570, Comp. Acts of the Phil. Comm.

This objection does not relate to a matter of form, but is substantial. *Carrington* v. *United States*, 208 U. S. 1. The omission of any statement in the record that the defendant

was present at the trial is another fatal defect. Certainly something more than an inference from the opinion of an appellate court is required to show that a person accused of a crime, that may be punished by a long term of imprisonment, was present at his trial. His presence was essential to a valid trial and could not be waived. 1 Bish. Cr. Pro. 271, 1353; *Hoyt* v. *Utah*, 110 U. S. 574.

The sentence in this case imposed a cruel and unusual punishment, and for that reason it should be set aside, even if the conviction be not reversed.

In *O'Neil* v. *Vermont*, 144 U. S. 323, the majority of the court refused to consider this question, because it was not assigned as error, and because the Eighth Amendment has always been held not to apply to the States; but see dissents of Justices Field, Harlan and Brewer. In *Waters-Pierce Oil Co.* v. *Texas*, 212 U. S. 111, it was held that a fine may be so unreasonable as to amount to taking property without due process of law. In *Paraiso* v. *United States*, 207 U. S. 368, the question arose but was not decided.

Adjudications on this question are few in number, but see *State* v. *G. H. & S, A. R. Co.*, 100 Texas, 153, 174, 175.

While all of the provisions of the Constitution of the United States relating to criminal proceedings, have not been extended to the Philippines certain provisions of the Constitution have been made applicable to the Philippine Islands under the act of July 1, 1902, including the prohibition against excessive bail and fines and cruel and unusual punishment.

The language of the act is the same as that of the Eighth Amendment, except that the word "punishment" is used instead of "punishments." *Pervear* v. *Commonwealth*, 5. Wall. 475; *Kemmler's Case*, 136 U. S. 436; *Howard* v. *Fleming*, 191 U. S. 126, 135, do not affect the present case.

As to the limitations on punishment under Amendment VIII, see Cooley's Const. Lim., 7th ed.; Maxwell's Crim. Proc., p. 661, cited with approval in *Charles* v. *State*, 27 Nebraska, 881; *Stoutenburg* v. *Frazier*, 16 App. D. C. 229, and *State* v. *Driver*,

78 N. C. 423, in which a punishment was held unusual because it was excessive. In it, the court citing the case of Lord Devonshire, 11 State Trials, 1354, in which the House of Lords held that a fine of £30,000 was excessive and exorbitant, against Magna Charta, and the common right of the subject and the laws of the land. See also *Hobbs* v. *State*, 32 N. E. Rep. 1019, and *Johnson* v. *Waukesha Co.*, 64 Wisconsin, 281, 288.

Penalties must be fixed with regard to the offense and cannot all be thrown in together, large and small, under the same measure of punishment. *Matter of Frazee*, 63 Michigan, 397, 408, and see *People* v. *Murray*, 76 Michigan, 10, reversing the judgment in the case for errors at the trial, and commenting upon the severity of a sentence of fifty years as being in violation of a clause of the state constitution prohibiting unusual punishments. In *State* v. *Whitaker*, 48 La. Ann. 527 a judgment was held void under a constitutional provision identical with the Eighth Amendment, because it sentenced the relators to imprisonment for 2,160 days in default of their paying fines aggregating $720. The legislature cannot inflict the death penalty as a punishment for a simple misdemeanor. *Thomas* v. *Kincaid*, 55 Arkansas, 502; *Martin* v. *Johnston*, 33 S. W. Rep. 306.

Where a statute fixes a minimum penalty but gives the court or jury a discretion to go beyond it such discretion must be exercised in reason and justice and in subordination to the constitutional provision prohibiting cruel and unusual punishments. *State* v. *Baker*, 3 So. Dak. 2941.

Courts would not be justified in interfering with the discretion and judgment of the legislature, except in very extreme cases, *Matter of Bayard*, 63 How. Pr. (N. Y.) *73, of punishments so disproportionate to the offense as to shock the sense of the community. Whether the punishment in a given case is cruel or unusual depends, of course, in some degree, upon the punishment inflicted for other offenses. See Penal Laws of the United States as revised and amended by act of March 4, 1909, 35 Stat. 1088, and Code of District of Colum-

bia of March 3, 1891, from which it will be seen, that, in many cases, either in the Federal statutes or in the District Code, there is no minimum term of imprisonment, that being left to the court. A law requiring a convicted person to be imprisoned for *not less than twelve years* cannot be found in any statute in this country save for the most enormous crimes. Certainly not for such a petty offense as that of which plaintiff in error has been convicted.

While under the Philippine laws some crimes are punished with a severity unknown to any jurisdiction in the United States, even there this sentence is oppressive to the last degree. For illustrations of penalties prescribed in the Philippines for other crimes, see § 390 of the Penal Code, by which a public official embezzling public funds can be punished as severely as the plaintiff in error, only if his embezzlement exceeds 125,000 pesetas.

Even under Philippine laws, one who is guilty of treason or misprision of treason or conspiracy to overthrow the Government of the United States or sedition or perjury may be sent to prison for only thirty days and, except only in case of treason, cannot be imprisoned for a longer term than from six to ten years; and one who embezzles any sum, however great, cannot be imprisoned for more than ten years, and may escape with two years.

*Mr. Assistant Attorney General Fowler*, with whom *Mr. Henry M. Hoyt*, formerly Solicitor General, was on the brief, for the United States:

The fact that the record fails to show that plaintiff in error was present during the trial is not a valid ground for reversal.

The third ground relied upon, that the punishment inflicted upon plaintiff in error is cruel and unusual, does not afford ground for jurisdiction, nor is the punishment cruel and unusual within the meaning of that expression as used in the act of July 1, 1902.

This question does not give ground for jurisdiction, be-

cause it was for the first time mentioned in brief of plaintiff in error in this court. *Paraiso v. United States,* 207 U. S. 368, 370; *Lawler* v. *Walker,* 14 How. 149, 152; *Spies* v. *Illinois,* 123 U. S. 131, 181; *Brooks* v. *Missouri,* 124 U. S. 394; *Morrison* v. *Watson,* 154 U. S. 111, 115; *Winona &c. Land Co.* v. *Minnesota,* 159 U. S. 540; *Oxley Stave Co.* v. *Butler Co.,* 166 U. S. 648, 658; *Citizens' Bank* v. *Owensboro,* 173 U. S. 636, 643; *Home for Incurables* v. *New York,* 187 U. S. 155, 157; *Johnson* v. *Insurance Co.,* 187 U. S. 491, 495; *Chicago Ry. Co.* v. *McGuire,* 196 U. S. 128; *Hurlbert* v. *Chicago,* 202 U. S. 275; *Osborne* v. *Clark,* 204 U. S. 565; *Serra* v. *Mortiga,* 204 U. S. 470; *Arkansas* v. *Schlierholz,* 179 U. S. 598; *Carey* v. *Houston &c. Ry. Co.,* 150 U. S. 170, 181; *Ansbro* v. *United States,* 159 U. S. 695; *Cornell* v. *Green,* 163 U. S. 75, 78; *Cincinnati &c. Ry. Co.* v. *Thiebaud,* 177 U. S. 615, 620.

The sentence imposed is not a cruel and unusual punishment within the meaning of that expression as used in the act of July 1, 1902, nor are the provisions of the Philippine Criminal Code, under which the sentence was pronounced, in contravention of the provisions of said act.

The law was one existing in the Philippine Islands at the time of their cession to the United States, and the Philippine Commission was charged by the President to maintain the body of laws which regulated the rights and obligations of the people, with as little change as expedient, and although this law has been enforced by the courts ever since the Philippines became territory of the United States, yet the Philippine Commission has not deemed it proper to modify this provision in any respect, notwithstanding the fact that they have enacted a very extensive criminal code which defines and provides punishment for a large variety of offenses. See Compilation of Acts of Phil. Com., tit. 44, pp. 1026–1052.

The prohibition of cruel and unusual punishment has no application to a punishment which only exceeds in degree such punishment as is usually inflicted in other jurisdictions for the same or like offense.

The statute which prohibits the falsification of records by a public official was not abrogated by the clause in the act of July 1, 1902, prohibiting cruel and unusual punishment, and it still remains unlawful to falsify such records even if the punishment provided be regarded as too severe; the court will not hold that that clause of the law is a nullity, and that there is no means of enforcing it, nor will it undertake to draw a line beyond which the law is a nullity and just where the punishment begins to be cruel and unusual.

The punishment imposed is not cruel or unusual within the meaning of the Philippine bill of rights.

The Philippine courts are guided in fixing the amount of a penalty by the circumstances attending the offense, whether extenuating or aggravating. See § 81 of the Penal Code.

The fine imposed is a moderate one.

There is nothing cruel or unusual in a long term of imprisonment, as the words are used in the Bill of Rights. The description there refers rather to mutilations and degradations, and not to length or duration of the punishment. The penalty of *cadena temporal*, which article 300 prescribes for this class of offenses, includes a term of imprisonment ranging from twelve years and one day to twenty years; articles 28, 96, Penal Code; and the sentence of fifteen years imposed here is therefore well within the law.

This court has not passed upon the meaning of the words cruel and unusual punishment. See *Wilkerson* v. *Utah*, 99 U. S. 130; *In re Kemmler*, 136 U. S. 436.

While the state courts are not entirely in accord as to the meaning of the term, the majority of the cases hold that the words employed in the Constitution signify such punishment as would amount to torture, or which is so cruel as to shock the conscience and reason of men; that something inhuman and barbarous is implied. *State* v. *Williams*, 88 Missouri, 310; *Miller* v. *State*, 49 N. E. Rep. 894; *Hobbs* v. *State*, 32 N. E. Rep. 1019; *In re Bayard*, 25 Hun, 546; *State* v. *Becker*, 51 N. W. Rep. 1018; *Territory* v. *Ketchum*, 65 Pac. Rep. 169;

*People* v. *Morris*, 45 N. W. Rep. 591. See also *O'Neil* v. *Vermont*, 144 U. S. 323, 331, quoting without disapproval, the opinion of the Supreme Court of Vermont sustaining a very large fine in the aggregate and a very long term of imprisonment in addition as not violating the constitutional guaranties.

If the punishment in this case seems excessive compared with the offense, it is for the Philippine legislative power or for Congress to change the law.

MR. JUSTICE McKENNA delivered the opinion of the court.[1]

This writ of error brings up for review the judgment of the Supreme Court of the Philippine Islands, affirming the conviction of plaintiff in error for falsifying a "public and official document."

In the "complaint," by which the prosecution was begun, it was charged that the plaintiff in error, "a duly appointed, qualified and acting disbursing officer of the Bureau of Coast Guard and Transportation of the United States Government of the Philippine Islands," did, as such, "corruptly and with intent, then and there, to deceive and defraud the United States Government of the Philippine Islands, and its officials, falsify a public and official document, namely, a cash book of the captain of the Board of Manila, Philippine Islands, and the Bureau of Coast Guard and Transportation of the United States Government of the Philippine Islands," kept by him as disbursing officer of that bureau. The falsification, which is alleged with much particularity, was committed by entering as paid out, "as wages of employés of the Light House Service

---

[1] This case was argued before seven justices, Mr. Justice Moody being absent on account of sickness and Mr. Justice Lurton not then having taken his seat. Mr. Justice Brewer died before the opinion was delivered. Mr. Justice McKenna delivered the opinion of the court, the Chief Justice, Mr. Justice Harlan and Mr. Justice Day concurring with him. Mr. Justice White delivered a dissenting opinion (p. 382, *post*), Mr. Justice Holmes concurring with him.

of the United States Government of the Philippine Islands," at the Capul Light House of 208 pesos, and for like service at the Matabriga Light House of 408 pesos, Philippine currency. A demurrer was filed to the "complaint," which was overruled.

He was convicted, and the following sentence was imposed upon him: "To the penalty of fifteen years of Cadena, together with the accessories of section 56 of the Penal Code, and to pay a fine of four thousand pesetas, but not to serve imprisonment as a subsidiary punishment in case of his insolvency, on account of the nature of the main penalty, and to pay the costs of this cause."

The judgment and sentence were affirmed by the Supreme Court of the islands.

It is conceded by plaintiff in error that some of the questions presented to the Supreme Court of the Philippine Islands cannot be raised in this court, as the record does not contain the evidence. Indeed, plaintiff in error confines his discussion to one point raised in the court below and to three other questions, which, though not brought to the attention of the Supreme Court of the islands, and not included in the assignment of errors filed with the application for the writ of error are of such importance, it is said, that this court will consider them under the right reserved in Rule 35.[1]

---

[1] Rule 35. Assignments of Errors. 1. Where an appeal or a writ of error is taken from a District Court or a Circuit Court direct to this court, under § 5 of the act entitled "An act to establish Circuit Courts of Appeals and to define and regulate in certain cases the jurisdiction of the courts of the United States, and for other purposes," approved March 3, 1891, the plaintiff in error or appellant shall file with the clerk of the court below, with his petition for the writ of error or appeal, an assignment of errors, which shall set out separately and particularly each error asserted and intended to be urged. No writ of error or appeal shall be allowed until such assignment of errors shall have been filed. When the error alleged is to the admission or to the rejection of evidence, the assignment of errors shall quote the full substance of the evidence admitted or rejected. When the error alleged is to the charge of the court, the assignment of errors shall set out the

These questions which are assigned as error on the argument here are as follows:

"1. The court below erred in overruling the demurrer to the complaint, this assignment being based upon the fact that in the complaint the plaintiff in error is described as the 'disbursing officer of the Bureau of Coast Guard and Transportation of the United States Government of the Philippine Islands,' and the cash book referred to in the complaint is described as a book 'of the captain of the port of Manila, Philippine Islands,' whereas there is no such body politic as the 'United States Government of the Philippine Islands.'

"2. The record does not disclose that the plaintiff in error was arraigned, or that he pleaded to the complaint after his demurrer was overruled and he was 'ordered to plead to the complaint.'

"3. The record does not show that the plaintiff in error was present when he was tried, or, indeed, that he was present in court at any time.

"4. The punishment of fifteen-years' imprisonment was a cruel and unusual punishment, and, to the extent of the sentence, the judgment below should be reversed on this ground."

The second assignment of error was based upon a misapprehension of the fact, and has been abandoned.

The argument to support the first assignment of error is based upon certain acts of Congress and certain acts of the Philippine Commission in which the Government of the United States and the government of the Islands are distinguished.

part referred to *totidem verbis*, whether it be in instructions given or in instructions refused. Such assignment of errors shall form part of the transcript of the record, and be printed with it. When this is not done counsel will not be heard, except at the request of the court; and errors not assigned according to this rule will be disregarded, but the court, at its option, may notice a plain error not assigned.

2. The plaintiff in error or appellant shall cause the record to be printed, according to the provisions of §§ 2, 3, 4, 5, 6, and 9 of Rule 10.

For this and all rules of the Supreme Court of the United States, see Appendix 210 U. S.

And it is urged that in one of the acts (§ 3396 of the acts of the commission) it is recognized that there may be allegiance to or treason against both or "either of them," and (§ 3397) that there may be "rebellion or insurrection against the authority" of either, and (§ 3398) that there may be a conspiracy to overthrow either or to "prevent, hinder or delay the execution of any law of either." Other sections are cited, in which, it is contended, that the insular government is spoken of as an "entity," and distinguished from that of the United States. Section 1366, which defines the duty of the Attorney General, it is pointed out, especially distinguishes between "causes, civil or criminal, to which the United States or any officer thereof in his official capacity is a party," and causes, civil or criminal, to which the "government of the Philippine Islands or any officer thereof in his official capacity is a party." And still more decisively, it is urged, by subdivision "C" of § 1366, in which it is recognized that the cause of action may be for money, and that the judgment may be for money "belonging to the Government of the United States, that of the Philippine Islands or some other province." It is, therefore, contended that the Government of the United States and that of the Philippine Islands are distinct legal entities, and that there may be civil obligations to one and not to the other, that there may be governmental liability to the one and not to the other, and that proceedings, civil or criminal, against either must recognize the distinction to be sufficient to justify a judgment. To apply these principles, let us see what the information charges. It describes Weems, plaintiff in error, as "a public official of the United States Government of the Philippine Islands, to wit, a duly appointed and qualified acting disbursing official of the Bureau of Coast Guard and Transportation of the United States Government of the Philippine Islands," and it is charged that by taking advantage of his official position to intend to "deceive and defraud the United States Government of the Philippine Islands," he falsified a public and official document. In the same manner the Gov-

ernment is designated throughout the information. It is contended that "there is no such body politic as the 'United States Government of the Philippine Islands,'" and, it is urged, that the objection does not relate to a matter of form. "It is as substantial," it is said, as the point involved in *Carrington's Case*, 208 U. S. 1, where a military officer of the United States was prosecuted as a civil officer of the government of the Philippines. . His conviction was reversed, this court holding that, "as a soldier, he was not an official of the Philippines but of the United States."

It is true that the distinctions raised are expressed in the statutes, and necessarily so. It would be difficult otherwise to provide for government where there is a paramount authority making use of subordinate instrumentalities. We have examples in the States of the Union and their lesser municipal divisions, and rights may flow from and to such lesser divisions. And the distinction in the Philippine statutes means no more than that, and, conforming to that, a distinction is clearly made in the information.. Weems' official position is described as "Disbursing Officer of the Bureau of Coast Guard and Transportation of the United States Government of the Philippine Islands." There is no real uncertainty in this description, and whatever technical nicety of discrimination might have been insisted on at one time, cannot now be, in view of the provisions of the Philippine Criminal Code of Procedure, which require a public offense to be described in "ordinary and concise language," not necessarily in the words of the statute, "but in such form as to enable a person of common understanding to know what is intended and the court to pronounce judgment according to the right." And it is further provided that "No information or complaint is insufficient nor can the trial, judgment, or other proceeding be affected by reason of a defect in matter of form which does not tend to prejudice a substantial right of the defendant upon the merits" (§ 10).

*Carrington* v. *United States*, 208 U. S. 1, is not in point. In

that case it was attempted to hold Carrington guilty of an offense as a civil officer for what he had done as a military officer. As he was the latter, he had not committed any offense under the statute. The first assignment of error is therefore not sustained.

It is admitted, as we have seen, that the questions presented by the third and fourth assignments of error were not made in the courts below, but a consideration of them is invoked under Rule 35, which provides that this court, "at its option, may notice a plain error not assigned."

It is objected on the other side that *Paraiso* v. *United States*, 207 U. S. 368, stands in the way. But the rule is not altogether controlled by precedent. It confers a discretion that may be exercised at any time, no matter what may have been done at some other time. It is true we declined to exercise it in *Paraiso* v. *United States*, but we exercised it in *Wiborg* v. *United States*, 163 U. S. 632, 658; *Clyatt* v. *United States*, 197 U. S. 207, 221, and *Crawford* v. *United States*, 212 U. S. 183. It may be said, however, that *Paraiso* v. *United States* is more directly applicable, as it was concerned with the same kind of a crime as that in the case at bar, and that it was contended there as here that the amount of fine and imprisonment imposed inflicted a cruel and unusual punishment. It may be that we were not sufficiently impressed with the importance of those contentions or saw in the circumstances of the case no reason to exercise our right of review under Rule 35. As we have already said, the rule is not a rigid one, and we have less reluctance to disregard prior examples in criminal cases than in civil cases, and less reluctance to act under it when rights are asserted which are of such high character as to find expression and sanction in the Constitution or bill of rights. And such rights are asserted in this case.

The assignment of error is that "A punishment of fifteen years' imprisonment was a cruel and unusual punishment, and, to the extent of the sentence, the judgment below should be reversed on this ground." Weems was convicted, as we

have seen, for the falsification of a public and official document, by entering therein, as paid out, the sums of 208 and 408 pesos, respectively, as wages to certain employés of the Light House service. In other words, in entering upon his cash book those sums as having been paid out when they were not paid out, and the "truth," to use the language of the statute, was thereby perverted "in the narration of facts."

A false entry is all that is necessary to constitute the offense. Whether an offender against the statute injures any one by his act or intends to injure any one is not material, the trial court held. The court said: "It is not necessary that there be any fraud nor even the desire to defraud, nor intention of personal gain on the part of the person committing it, that a falsification of a public document be punishable; it is sufficient that the one who committed it had the intention to pervert the truth and to falsify the document, and that by it damage might result to a third party." The court further, in the definition of the nature of the offense and the purpose of the law, said, "in public documents the law takes into consideration not only private interests, but also the interests of the community," and it is its endeavor (and for this a decision of the Supreme Court of Spain, delivered in 1873, was quoted) "to protect the interest of society by the most strict faithfulness on the part of a public official in the administration of the office intrusted to him," and thereby fulfill the "responsibility of the State to the community for the official or public documents under the safeguard of the State." And this was attempted to be secured through the law in controversy. It is found in § 1 of chapter IV of the Penal Code of Spain. The caption of the section is "falsification of official and commercial documents and telegraphic dispatches." Article 300 provides as follows: "The penalties of *cadena temporal* and a fine of from 1,250 to 12,500 pesetas shall be imposed on a public official who, taking advantage of his authority, shall commit a falsification . . . by perverting the truth in the narration of facts. . . ."

By other provisions of the code we find that there are only

two degrees of punishment higher in scale than *cadena tem-
poral*, death, and *cadena perpetua*. The punishment of *cadena
temporal* is from twelve years and one day to twenty years
(arts. 28 and 96), which "shall be served" in certain "penal
institutions." And it is provided that "those sentenced to
*cadena temporal* and *cadena perpetua* shall labor for the benefit
of the state. They shall always carry a chain at the ankle,
hanging from the wrists; they shall be employed at hard and
painful labor, and shall receive no assistance whatsoever from
without the institution." Arts. 105, 106. There are besides
certain accessory penalties imposed, which are defined to be
(1) civil interdiction; (2) perpetual absolute disqualification;
(3) subjection to surveillance during life. These penalties are
defined as follows.

"Art. 42. Civil interdiction shall deprive the person pun-
ished as long as he suffers it, of the rights of parental au-
thority, guardianship of person or property, participation in
the family council, marital authority, the administration of
property, and the right to dispose of his own property by acts
*inter vivos*. Those cases are excepted in which the law ex-
plicitly limits its effects.

"Art. 43. Subjection to the surveillance of the authorities
imposes the following obligations on the persons punished.

" 1. That of fixing his domicil and giving notice thereof to
the authority immediately in charge of his surveillance, not
being allowed to change it without the knowledge and per-
mission of said authority in writing.

"2. To observe the rules of inspection prescribed.

"3. To adopt some trade, art, industry, or profession,
should he not have known means of subsistence of his own.

"Whenever a person punished is placed under the surveil-
lance of the authorities, notice thereof shall be given to the
government and to the governor general."

The penalty of perpetual absolute disqualification is the
deprivation of office, even though it be held by popular elec-
tion, the deprivation of the right to vote or to be elected to

public office, the disqualification to acquire honors, etc., and the loss of retirement pay, etc.

These provisions are attacked as infringing that provision of the bill of rights of the islands which forbids the infliction of cruel and unusual punishment. It must be confessed that they, and the sentence in this case, excite wonder in minds accustomed to a more considerate adaptation of punishment to the degree of crime. In a sense the law in controversy seems to be independent of degrees. One may be an offender against it, as we have seen, though he gain nothing and injure nobody. It has, however, some human indulgence—it is not exactly Draconian in uniformity. Though it starts with a severe penalty, between that and the maximum penalty it yields something to extenuating circumstances. Indeed, by article 96 of the Penal Code the penalty is declared to be "divisible," and the legal term of its "duration is understood as distributed into three parts forming the three degrees—that is, the minimum, medium, and maximum," being respectively from twelve years and one day to fourteen years and eight months, from fourteen years eight months and one day to seventeen years and four months, from seventeen years four months and one day to twenty years. The law therefore allows a range from twelve years and a day to twenty years, and the Government in its brief ventures to say that "the sentence of fifteen years is well within the law." But the sentence is attacked as well as the law, and what it is to be well within the law a few words will exhibit. The minimum term of imprisonment is twelve years, and that, therefore, must be imposed for "perverting the truth" in a single item of a public record, though there be no one injured, though there be no fraud or purpose of it, no gain or desire of it. Twenty years is the maximum imprisonment, and that only can be imposed for the perversion of truth in every item of an officer's accounts, whatever be the time covered and whatever fraud it conceals or tends to conceal. Between these two possible sentences, which seem to have no adaptable relation, or rather

in the difference of eight years for the lowest possible offense
and the highest possible, the courts below selected three years
to add to the minimum of twelve years. and a day for the
falsification of two items of expenditure, amounting to the
sums of 408 and 204 pesos. And the fine and "accesories"
must be brought into view. The fine was four thousand
pesetas, an excess also over the minimum. The "accesories"
we have already defined. We can now give graphic description
of Weems' sentence and of the law under which it was im-
posed. Let us confine it to the minimum degree of the law,
for it is with the law that we are most concerned. Its mini-
mum degree is confinement in a penal institution for twelve
years and one day, a chain at the ankle and wrist of the of-
fender, hard and painful labor, no assistance from friend or
relative, no marital authority or parental rights or rights of
property, no participation even in the family council. These
parts of his penalty endure for the term of imprisonment.
From other parts there is no intermission. His prison bars
and chains are removed, it is true, after twelve years, but he
goes from them to a perpetual limitation of his liberty. He is
forever kept under the shadow of his crime, forever kept
within voice and view of the criminal magistrate, not being
able to change his domicil without giving notice to the "au-
thority immediately in charge of his surveillance," and with-
out permission in writing. He may not seek, even in other
scenes and among other people, to retrieve his fall from recti-
tude. Even that hope is taken from him and he is subject to
tormenting regulations that, if not so tangible as iron bars
and stone walls, oppress as much by their continuity, and de-
prive of essential liberty. No circumstance of degradation
is omitted. It may be that even the cruelty of pain is not
omitted. He must bear a chain night and day. He is con-
demned to painful as well as hard labor. What painful labor
may mean we have no exact measure. It must be something
more than hard labor. It may be hard labor pressed to the
point of pain. Such penalties for such offenses amaze those

who have formed their conception of the relation of a state to even its offending citizens from the practice of the American commonwealths, and believe that it is a precept of justice that punishment for crime should be graduated and proportioned to offense.

Is this also a precept of the fundamental law? We say fundamental law, for the provision of the Philippine bill of rights, prohibiting the infliction of cruel and unusual punishment, was taken from the Constitution of the United States and must have the same meaning. This was decided in *Kepner* v. *United States*, 195 U. S. 100, 122; and *Serra* v. *Mortiga*, 204 U. S. 470. In *Kepner* v. *United States* this court considered the instructions of the President to the Philippine Commission and quoted from them the admonition to the commission that the government that we were establishing was not designed "for our satisfaction or for the expression of our theoretical views, but for the happiness, peace and prosperity of the people of the Philippine Islands, and the measures adopted should be made to conform to their customs, their habits, and even their prejudices, to the fullest extent consistent with the accomplishment of the indispensable requisites of just and effective government." But, it was pointed out, a qualification accompanied the admonition, and the commission was instructed "to bear in mind" and the people of the islands "made plainly to understand" that certain great principles of government had been made the basis of our governmental system which were deemed "essential to the rule of law and the maintenance of individual freedom." And the President further declared that there were "certain practical rules of government which we have found to be essential to the preservation of those great principles of liberty and law." These he admonished the commission to establish and maintain in the islands "for the sake of their liberty and happiness," however they might conflict with the customs or laws of procedure with which they were familiar. In view of the importance of these principles and rules, which the President said the "enlightened

thought of the Philippine Islands" would come to appreciate, he imposed their observance "upon every division and branch of the government of the Philippines."

Among those rules was that which prohibited the infliction of cruel and unusual punishment. It was repeated in the act of July 1, 1902, providing for the administration of the affairs of the civil government in the islands, and this court said of it and of the instructions of the President that they were "intended to carry to the Philippine Islands those principles of our government which the President declared to be established as rules of law for the maintenance of individual freedom." The instructions of the President and the act of : Congress found in nominal existence in the islands the Penal Code of Spain, its continuance having been declared by military order. It may be there was not and could not be a careful consideration of its provisions and a determination to what extent they accorded with or were repugnant to the "great principles of liberty and law" which had been "made the basis of our governmental system." Upon the institution of the government of the commission, if not before, that consideration and determination necessarily came to the courts and are presented by this record.

What constitutes a cruel and unusual punishment has not been exactly decided. It has been said that ordinarily the terms imply something inhuman and barbarous, torture and the like. *McDonald* v. *Commonwealth*, 173 Massachusetts, 322. The court, however, in that case conceded the possibility "that imprisonment in the State prison for a long term of years might be so disproportionate to the offense as to constitute a cruel and unusual punishment." Other cases have selected certain tyrannical acts of the English monarchs as illustrating the meaning of the clause and the extent of its prohibition.

The provision received very little debate in Congress. We find from the Congressional Register, p. 225, that Mr. Smith of South Carolina "objected to the words 'nor cruel and

unusual punishment,' the import of them being too indefinite."
Mr. Livermore opposed the adoption of the clause, saying:

"The clause seems to express a great deal of humanity, on
which account I have no objection to it; but as it seems to
have no meaning in it, I do not think it necessary. What is
meant by the terms excessive bail? Who are to be the judges?
What is understood by excessive fines? It lays with the court
to determine. No cruel and unusual punishment is to be
inflicted; it is sometimes necessary to hang a man, villains
often deserve whipping, and perhaps having their ears cut
off; but are we, in future, to be prevented from inflicting these
punishments because they are cruel? If a more lenient mode
of correcting vice and deterring others from the commission
of it could be invented, it would be very prudent in the legis-
lature to adopt it, but until we have some security that this
will be done, we ought not to be restrained from making neces-
sary laws by any declaration of this kind."

The question was put on the clause, and it was agreed to
by a considerable majority.

No case has occurred in this court which has called for an
exhaustive definition. In *Pervear* v. *The Commonwealth,* 5
Wall. 475, it was decided that the clause did not apply to
state but to national legislation. But we went further, and
said that we perceive nothing excessive, or cruel or unusual
in a fine for fifty dollars and imprisonment at hard labor in
the house of correction for three months, which was imposed
for keeping and maintaining, without a license, a tenement
for the illegal sale and illegal keeping of intoxicating liquors.
A decision from which no one will dissent.

In *Wilkerson* v. *Utah,* 99 U. S. 130, the clause came up
again for consideration. A statute of Utah provided that "a
person convicted of a capital offense should suffer death by
being shot, hanged or beheaded," as the court might direct,
or he should "have his option as to the manner of his execu-
tion." The statute was sustained. The court pointed out
that death was an usual punishment for murder, that it pre-

vailed in the Territory for many years, and was inflicted by shooting, also that that mode of execution was usual under military law.   It was hence concluded that it was not forbidden by the Constitution of the United States as cruel or unusual.   The court quoted Blackstone as saying that the sentence of death was generally executed by hanging, but also that circumstances of terror, pain or disgrace were sometimes superadded.   "Cases mentioned by the author," the court said, "are where the person was drawn or dragged to the place of execution, in treason; or where he was disembowelled alive, beheaded and quartered, in high treason.   Mention is also made of public dissection in murder and burning alive in treason committed by a female."   And it was further said: "Examples of such legislation in the early history of the parent country are given by the annotator of the last edition of Archbold's treatise.   Arch. Crim. Pr. Pl. (eighth edition) 548."

This court's final commentary was that "Difficulty would attend the effort to define with exactness the extent of the constitutional provision which provides that cruel and unusual punishments shall not be inflicted; but it is safe to affirm that punishments of torture, such as those mentioned by the commentator referred to, and all others in the same line of unnecessary cruelty, are forbidden by that amendment to the Constitution.   Cooley, Const. Lim. (4th ed.) 408; Wharton, Cr. L. (7th ed.), § 3405."

That passage was quoted in *In re Kemmler*, 136 U. S. 436, 447, and this comment was made: "Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel, within the meaning of that word as used in the Constitution.   It implies there something inhuman and barbarous, and something more than the mere extinguishment of life."   The case was an application for *habeas corpus* and went off on a question of jurisdiction, this court holding that the Eighth Amendment did not apply to state legislation.   It was not meant in the language we have quoted to give a comprehensive definition of cruel and unusual

punishment, but only to explain the application of the provision to the punishment of death. In other words, to describe what might make the punishment of death, cruel and unusual, though of itself it is not so. It was found as a fact by the state court that death by electricity was more humane than death by hanging.

In *O'Neil* v. *Vermont,* 144 U. S. 323, the question was raised but not decided. The reasons given for this were that because it was not as a Federal question assigned as error, and, so far as it arose under the constitution of Vermont, it was not within the province of the court to decide. Moreover, it was said, as a Federal question, it had always been ruled that the Eighth Amendment of the Constitution of the United States did not apply to the States. Mr. Justice Field, Mr. Justice Harlan and Mr. Justice Brewer were of the opinion that the question was presented, and Mr. Justice Field, construing the clause of the Constitution prohibiting the infliction of cruel and unusual punishments, said, the other two justices concurring, that the inhibition was directed, not only against punishments which inflict torture, "but against all punishments which by their excessive length or severity are greatly disproportioned to the offenses charged." He said further: "The whole inhibition is against that which is excessive in the bail required or fine imposed, or punishment inflicted."

The law writers are indefinite. Story in his work on the Constitution, vol. 2, § 1903, says that the provision "is an exact transcript of a clause in the bill of rights framed in the revolution of 1688. He expressed the view that the provision "would seem to be wholly unnecessary in a free government, since it is scarcely possible that any department of such a government should authorize or justify such atrocious conduct." He, however, observed that it was "adopted as an admonition to all departments of the national government, to warn them against such violent proceedings as has taken place in England in the arbitrary reigns of some of the Stuarts." For this he cites 2 Elliott's Debates, 345, and refers to 2 Lloyd's

Debates, 225, 226; 3 Elliott's Debates, 345. If the learned author meant by this to confine the prohibition of the provision to such penalties and punishment as were inflicted by the Stuarts, his citations do not sustain him. Indeed, the provision is not mentioned except in 2 Elliott's Debates, from which we have already quoted. The other citations are of the remarks of Patrick Henry in the Virginia Convention, and of Mr. Wilson in the Pennsylvania Convention. Patrick Henry said that there was danger in the adoption of the Constitution without a bill of rights. Mr. Wilson considered that it was unnecessary, and had been purposely omitted from the Constitution. Both, indeed, referred to the tyranny of the Stuarts. Henry said that the people of England in the bill of rights prescribed to William, Prince of Orange, upon what terms he should reign. Wilson said that "The doctrine and practice of a declaration of rights have been borrowed from the conduct of the people of England on some remarkable occasions; but the principles and maxims on which their government is constituted are widely different from those of ours." It appears, therefore, that Wilson, and those who thought like Wilson, felt sure that the spirit of liberty could be trusted, and that its ideals would be represented, not debased, by legislation. Henry and those who believed as he did would take no chances. Their predominant political impulse was distrust of power, and they insisted on constitutional limitations against its abuse. But surely they intended more than to register a fear of the forms of abuse that went out of practice with the Stuarts. Surely, their jealously of power had a saner justification than that. They were men of action, practical and sagacious, not beset with vain imagining, and it must have come to them that there could be exercises of cruelty by laws other than those which inflicted bodily pain or mutilation. With power in a legislature great, if not unlimited, to give criminal character to the actions of men, with power unlimited to fix terms of imprisonment with what accompaniments they might, what more potent instrument of cruelty

could be put into the hands of power? · And it was believed
that power might be tempted to cruelty. This was the motive
of the clause, and if we are to attribute an intelligent provi-
dence to its advocates we cannot think that it was intended
to prohibit only practices like the Stuarts, or to prevent only
an exact repetition of history. We cannot think that the
possibility of a coercive cruelty being exercised through other
forms of punishment was overlooked. We say "coercive cru-
elty," because there was more to be considered than the ordi-
nary criminal laws. Cruelty might become an instrument of
tyranny; of zeal for a purpose, either honest or sinister.

Legislation, both statutory and constitutional, is enacted,
it is true, from an experience of evils, but its general language
should not, therefore, be necessarily confined to the form that
evil had theretofore taken. Time works changes, brings into
existence new conditions and purposes. Therefore a principle
to be vital must be capable of wider application than the
mischief which gave it birth. This is peculiarly true of consti-
tutions. They are not ephemeral enactments, designed to
meet passing occasions. They are, to use·the words of Chief
Justice Marshall, "designed to approach immortality as nearly
as human institutions can approach it." The future is their
care and provision for events of good and bad tendencies of
which no prophecy can be made. In the application of a
constitution, therefore, our contemplation cannot be only of
what has been but of what may be. Under any other rule a
constitution would indeed be as easy of application as it would
be deficient in efficacy and power. Its general principles
would have little value and be converted by precedent' into
impotent and lifeless formulas. Rights declared in words
might be lost in reality. And this has been recognized. The
meaning and vitality of the Constitution have developed
against narrow and restrictive construction. There is an ex-
ample of this in *Cummings* v. *State of Missouri,* 4 Wall. 277,
where the prohibition against *ex post facto* laws was given a
more extensive application than what a minority of this court

thought had been given in *Calder* v. *Bull*, 3 Dall. 386. See also *Ex parte Garland*, 4 Wall. 333. The construction of the Fourteenth Amendment is also an example for it is one of the limitations of the Constitution. In a not unthoughtful opinion Mr. Justice Miller expressed great doubt whether that Amendment would ever be held as being directed against any action of a State which did not discriminate "against the negroes as a class, or on account of their race." *Slaughterhouse Cases*, 16 Wall. 36, 81. To what extent the Amendment has expanded beyond that limitation need not be instanced.

There are many illustrations of resistance to narrow constructions of the grants of power to the National Government. One only need be noticed, and we select it because it was made against a power which more than any other is kept present to our minds in visible and effective action. We mean the power over interstate commerce. This power was deduced from the eleven simple words, "to regulate commerce with foreign nations and among the several States." The judgment which established it was pronounced by Chief Justice Marshall (*Gibbons* v. *Ogden*), and reversed a judgment of Chancellor Kent, justified, as that celebrated jurist supposed, by a legislative practice of fourteen years and fortified by the opinions of men familiar with the discussions which had attended the adoption of the Constitution. Persuaded by such considerations the learned chancellor confidently decided that the Congressional power related to "external, not to internal, commerce," and adjudged that under an act of the State of New York, Livingston and Fulton had the exclusive right of using steamboats upon all of the navigable waters of the State. The strength of the reasoning was not underrated. It was supported, it was said, "by great names, by names which have all the titles to consideration that virtue, intelligence and office can bestow." The narrow construction, however, did not prevail, and the propriety of the arguments upon which it was based was questioned. It was said, in effect, that they supported a construction which "would cripple the govern-

ment and render it unequal to the objects for which it was. declared to be instituted, and to which the powers given, as fairly understood, render it competent; . . ."

But general discussion we need not farther pursue. We may rely on the conditions which existed when the Constitution was adopted. As we have seen, it was the thought of Story, indeed, it must come to a less trained reflection than his, that government by the people instituted by the Constitution would not imitate the conduct of arbitrary monarchs. The abuse of power might, indeed, be apprehended, but not that it would be manifested in provisions or practices which would shock the sensibilities of men.

Cooley, in his "Constitutional Limitations," apparently in a struggle between the effect to be given to ancient examples and the inconsequence of a dread of them in these enlightened times, is not very clear or decisive. He hesitates to advance definite views and expresses the "difficulty of determining precisely what is meant by cruel and unusual punishment." It was probable, however, he says, that "any punishment declared by statute for an offense which was punishable in the same way at common law could not be regarded as cruel or unusual, in a constitutional sense." And he says further that "probably any new statutory offense may be punished to the *extent* [italics ours] and in the mode permitted by the common law for offenses of a similar nature."

In the cases in the state courts different views of the provision are taken. In *State* v. *Driver*, 78 N. C. 423, 427, it was said that criminal legislation and its administration are so uniformly humane that there is seldom occasion for complaint. In that case a sentence of the defendant for assault and battery upon his wife was imprisonment in the county jail for five years, and at the expiration thereof to give security to keep the peace for five years in the sum of $500 with sureties, was held to be cruel and unusual. To sustain its judgment the court said that the prohibition against cruel and unusual punishment was not "intended to warn against merely erratic

modes of punishment or torture, but applied expressly to 'bail,' 'fines' and 'punishments.'" It was also said that "the earliest application of the provision in England was in 1689, the first year after the adoption of the bill of rights in 1688, to avoid an excessive pecuniary fine imposed upon Lord Devonshire by the court of King's Bench (11 State Trials, 1354)." Lord Devonshire was fined thirty thousand pounds for an assault and battery upon Colonel Culpepper, and the House of Lords, in reviewing the case, took the opinion of the law Lords, and decided that the fine "was excessive and exorbitant, against Magna Charta, the common right of the subject and the law of the land." Other cases have given a narrower construction, feeling constrained thereto by the incidences of history.

In *Hobbs* v. *State*, 32 N. E. Rep. 1019, the Supreme Court of Indiana expressed the opinion that the provision did not apply to punishment by "fine or imprisonment or both, but such as that inflicted at the whipping post, in the pillory, burning at the stake, breaking on the wheel," etc.

It was further said: "The word, according to modern interpretation, does not affect legislation providing imprisonment for life or for years or the death penalty by hanging or electrocution. If it did, our laws for the punishment of crime would give no security to the citizen." That conclusion certainly would not follow and its expression can only be explained by the impatience the court exhibited at the contention in that case, which attacked a sentence of two years' imprisonment in the state prison for combining to assault, beat and bruise a man in the night time. Indeed the court ventured the inquiry "whether in this country, at the close of the nineteenth century," the provision was "not obsolete," except as an admonition to the courts "against the infliction of punishment so severe as not to 'fit the crime.'" In other words, that it had ceased to be a restraint upon legislatures and had become an admonition only to the courts not to abuse the discretion which might be entrusted to them. Other cases might

be cited in illustration, some looking backwards for examples
by which to fix the meaning of the clause; others giving a
more expansive and vital character to the provision, such as
the President of the United States thought it possessed and
admonished the Philippine Commission that it possessed as
"essential [with other rights] to the rule of law and the main-
tenance of individual freedom."

An extended review of the cases in the state courts inter-
preting their respective constitutions we will not make. It
may be said of all of them that there was not such challenge
to the import and consequence of the inhibition of cruel and
unusual punishments as the law under consideration presents.
It has no fellow in American legislation. Let us remember
that it has come to us from a government of a different form
and genius from ours. It is cruel in its excess of imprison-
ment and that which accompanies and follows imprisonment.
It is unusual in its character. Its punishments come under
the condemnation of the bill of rights, both on account of
their degree and kind. And they would have those bad at-
tributes even if they were found in a Federal enactment and
not taken from an alien source.

Many of the state cases which have been brought to our
attention require no comment. They are based upon sen-
tences of courts, not upon the constitutional validity of laws.
The contentions in other cases vary in merit and in their
justification of serious consideration. We have seen what the
contention was in *Hobbs* v. *State, supra.* In others, however,
there was more inducement to an historical inquiry. In *Com-
monwealth* v. *Wyatt,* 6 Rand. 694, the whipping post had to
be justified and was justified. In comparison with the "bar-
barities of quartering, hanging in chains, castration, etc.," it
was easily reduced to insignificance. The court in the latter
case pronounced it "odious but not unusual." Other cases
have seen something more than odiousness in it, and have
regarded it as one of the forbidden punishments. It is cer-
tainly as odious as the pillory, and the latter has been pro-

nounced to be within the prohibitory clause. Whipping was also sustained in *Foot* v. *State*, 59 Maryland, 264, as a punishment for wife beating. And, it may be, in *Aldridge* v. *Commonwealth*, 2 Va. Cases, 447. The law considered was one punishing free negroes and mulattoes for grand larceny. Under the law a free person of color could be condemned to be sold as a slave and transported and banished beyond the limits of the United States. Such was the judgment pronounced on the defendant by the trial court and in addition thirty-nine stripes on his bare back. The judgment was held valid on the ground that the bill of rights of the State was "never designed to control the legislative right to determine *ad libitum* upon the adequacy of punishment, but is merely applicable to the modes of punishment." Cooley in his Constitutional Limitations says that it may be well doubted if the right exist "to establish the whipping post and the pillory in those States where they were never recognized as instruments of punishment, or in those States whose constitutions, revised since public opinion had banished them, have forbidden cruel and unusual punishments." The clause of the Constitution in the opinion of the learned commentators may be therefore progressive, and is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice. See *Ex parte Wilson*, 114 U. S. 417, 427; *Mackin* v. *United States*, 117 U. S. 348, 350.

In *Hobbs* v. *State, supra,* and in other cases, prominence is given to the power of the legislature to define crimes and their punishment. We concede the power in most of its exercises. We disclaim the right to assert a judgment against that of the legislature of the expediency of the laws or the right to oppose the judicial power to the legislative power to define crimes and fix their punishment, unless that power encounters in its exercise a constitutional prohibition. In such case not our discretion but our legal duty, strictly defined and imperative in its direction, is invoked. Then the legislative power is brought to the judgment of a power superior to it for the

instant. And for the proper exercise of such power there must be a comprehension of all that the legislature did or could take into account, that is, a consideration of the mischief and the remedy. However, there is a certain subordination of the judiciary to the legislature. The function of the legislature is primary, its exercises fortified by presumptions of right and legality, and is not to be interfered with lightly, nor by any judicial conception of their wisdom or propriety. They have no limitation, we repeat, but constitutional ones, and what those are the judiciary must judge. We have expressed these elementary truths to avoid the misapprehension that we do not recognize to the fullest the wide range of power that the legislature possesses to adapt its penal laws to conditions as they may exist and punish the crimes of men according to their forms and frequency. We do not intend in this opinion to express anything that contravenes those propositions.

Our meaning may be illustrated. For instance, in *Territory* v. *Ketchum,* 10 N. M. 718, a case that has been brought to our attention as antagonistic to our views of cruel and unusual punishments, a statute was sustained which imposed the penalty of death upon any person who should make an assault upon any railroad train, car or locomotive for the purpose and with the intent to commit murder, robbery or other felony upon a passenger or employé, express messenger or mail agent. The Supreme Court of the Territory discussed the purpose of the Eighth Amendment and expressed views opposed to those we announce in this opinion, but finally rested its decision upon the conditions which existed in the Territory and the circumstances of terror and danger which accompanied the crime denounced. So also may we mention the legislation of some of the States enlarging the common-law definition of burglary, and dividing it into degrees, fixing a severer punishment for that committed in the night time from that committed in the day time, and for arson of buildings in which human beings may be from arson of buildings which may be

vacant. In all such cases there is something more to give character and degree to the crimes than the seeking of a felonious gain and it may properly become an element in the measure of their punishment.

From this comment we turn back to the law in controversy. Its character and the sentence in this case may be illustrated by examples even better than it can be represented by words. There are degrees of homicide that are not punished so severely, nor are the following crimes: misprision of treason, inciting rebellion, conspiracy to destroy the Government by force, recruiting soldiers in the United States to fight against the United States, forgery of letters patent, forgery of bonds and other instruments for the purpose of defrauding the United States, robbery, larceny and other crimes. Section 86 of the Penal Laws of the United States, as revised and amended by the act of Congress of March 4, 1909, c. 321 (35 Stat. 1088), provides that any person charged with the payment of any appropriation made by Congress who shall pay to any clerk or other employé of the United States a sum less than that provided by law and require a receipt for a sum greater than that paid to and received by him shall be guilty of embezzlement, and shall be fined in double the amount so withheld and imprisoned not more than two years. The offense described has similarity to the offense for which Weems was convicted, but the punishment provided for it is in great contrast to the penalties of *cadena temporal* and its "accesories." If we turn to the legislation of the Philippine Commission we find that instead of the penalties of *cadena temporal*, medium degree, (fourteen years eight months and one day to seventeen years and four months, with fine and "accesories"), to *cadena perpetua*, fixed by the Spanish penal code for the falsification of bank notes and other instruments authorized by the law of the kingdom, it is provided that the forgery of or counterfeiting the obligations or securities of the United States or of the Philippine Islands shall be punished by a fine of not more than ten thousand pesos and by imprisonment of not more than

fifteen years. In other words, the highest punishment possible for a crime which may cause the loss of many thousand of dollars, and to prevent which the duty of the State should be as eager as to prevent the perversion of truth in a public document, is not greater than that which may be imposed for falsifying a single item of a public account. And this contrast shows more than different exercises of legislative judgment. It is greater than that. It condemns the sentence in this case as cruel and unusual. It exhibits a difference between unrestrained power and that which is exercised under the spirit of constitutional limitations formed to establish justice. The State thereby suffers nothing and loses no power. The purpose of punishment is fulfilled, crime is repressed by penalties of just, not tormenting, severity, its repetition is prevented, and hope is given for the reformation of the criminal.

It is suggested that the provision for imprisonment in the Philippine code is separable from the accessory punishment, and that the latter may be declared illegal, leaving the former to have application. *United States* v. *Pridgeon,* 153 U. S. 48, is referred to. The proposition decided in that case was that "where a court has jurisdiction of the person and the offense, the imposition of a sentence in excess of what the law permits does not render the legal and authorized portion of the sentence void, but only leaves such portion of the sentence as may be in excess open to question and attack." This proposition is not applicable to the case at bar. The imprisonment and the accessories were in accordance with the law. They were not in excess of it, but were positively required by it. It is provided in article 106, as we have seen, that those sentenced to *cadena temporal* shall labor for the benefit of the State; shall always carry a chain at the ankle, hanging from the wrist; shall be employed at hard and painful labor; shall receive no assistance whatsoever from without the penal institutions. And it is provided in article 56 that the penalty of *cadena temporal* shall include the accessory penalties.

In *In re Graham,* 138 U. S. 461, it was recognized to be "the

general rule that a judgment rendered by a court in a criminal case must conform strictly to the statute, and that any variation from its provisions, either in the character or the extent of punishment inflicted, renders the judgment absolutely void. . . ." In *Ex parte Karstendick*, 93 U. S. 396, 399, it was said: "In cases where the statute makes hard labor a part of the punishment, it is imperative upon the court to include that in its sentence." A similar view was expressed in *In re Mills*, 135 U. S. 263, 266. It was recognized in *United States* v. *Pridgeon* and the cases quoted which sustained it.

The Philippine code unites the penalties of *cadena temporal*, principal and accessory, and it is not in our power to separate them, even if they are separable, unless their independence is such that we can say that their union was not made imperative by the legislature. *Employers' Liability Cases*, 207 U. S. 463. This certainly cannot be said of the Philippine code, as a Spanish enactment, and the order putting it into effect in the islands did not attempt to destroy the unity of its provisions or the effect of that unity. In other words, it was put into force as it existed with all its provisions dependent. We cannot, therefore, declare them separable.

It follows from these views that, even if the minimum penalty of *cadena temporal* had been imposed, it would have been repugnant to the bill of rights. In other words, the fault is in the law, and, as we are pointed to no other under which a sentence can be imposed, the judgment must be reversed, with directions to dismiss the proceedings.

*So ordered.*

MR. JUSTICE LURTON, not being a member of the court when this case was argued, took no part in its decision.

MR. JUSTICE WHITE, dissenting.

The Philippine law made criminal the entry in a public record by a public official of a knowingly false statement. The

punishment prescribed for violating this law was fine and imprisonment in a penal institution at hard and painful labor for a period ranging from twelve years and a day to twenty years, the prisoner being subjected, as accessories to the main punishment, to carrying during his imprisonment a chain at the ankle hanging from the wrist, deprivation during the term of imprisonment of civil rights, and subjection besides to perpetual disqualification to enjoy political rights, hold office, etc., and, after discharge, to the surveillance of the authorities. The plaintiff in error, having been convicted of a violation of this law, was sentenced to pay a small fine and to undergo imprisonment for fifteen years, with the resulting accessory punishments above referred to. Neither at the trial in the court of first instance nor in the Supreme Court of the Philippine Islands was any question raised concerning the repugnancy of the statute defining the crime and fixing its punishment to the provision of the Philippine bill of rights, forbidding cruel and unusual punishment. Indeed, no question on that subject was even indirectly referred to in the assignments of error filed in the court below for the purpose of this writ of error. In the brief of counsel, however, in this court the contention was made that the sentence was void, because the term of imprisonment was a cruel and unusual one and therefore repugnant to the bill of rights. Deeming this contention to be of such supreme importance as to require it to be passed upon, although not raised below, the court now holds that the statute, because of the punishment which it prescribes, was repugnant to the bill of rights and therefore void, and for this reason alone reverses and remands with directions to discharge.

The Philippine bill of rights which is construed and applied is identical with the cruel and unusual punishment clause of the Eighth Amendment. Because of this identity it is now decided that it is necessary to give to the Philippine bill of rights the meaning properly attributable to the provision on the same subject found in the Eighth Amendment, as in using the language of that Amendment in the statute it is to be

presumed that Congress intended to give to the words their constitutional significance. The ruling now made, therefore, is an interpretation of the Eighth Amendment, and announces the limitation which that Amendment imposes on Congress when exercising its legislative authority to define and punish crime. The great importance of the decision is hence obvious.

Of course, in every case where punishment is inflicted for the commission of crime, if the suffering of the punishment by the wrongdoer be alone regarded the sense of compassion aroused would mislead and render the performance of judicial duty impossible. And it is to be conceded that this natural conflict between the sense of commiseration and the commands of duty is augmented when the nature of the crime defined by the Philippine law and the punishment which that law prescribes is only abstractly considered, since the impression is at once produced that the legislative authority has been severely exerted. I say only abstractly considered, because the first impression produced by the merely abstract view of the subject is met by the admonition that the duty of defining and punishing crime has never in any civilized country been exerted upon mere abstract considerations of the inherent nature of the crime punished, but has always involved the most practical consideration of the tendency at a particular time to commit certain crimes, of the difficulty of repressing the same, and of how far it is necessary to impose stern remedies to prevent the commission of such crimes. And, of course, as these considerations involve the necessity for a familiarity with local conditions in the Philippine Islands which I do not possess, such want of knowledge at once additionally admonishes me of the wrong to arise from forming a judgment upon insufficient data or without a knowledge of the subject-matter upon which the judgment is to be exerted. Strength, indeed, is added to this last suggestion by the fact that no question concerning the subject was raised in the courts below or there considered, and, therefore, no opportunity was afforded those courts, presumably, at least, relatively familiar with the local

conditions, to express their views as to the considerations which may have led to the prescribing of the punishment in question.   Turning aside, therefore, from mere emotional tendencies and guiding my judgment alone by the aid of the reason at my command, I am unable to agree with the ruling of the court.   As, in my opinion, that ruling rests upon an interpretation of the cruel and unusual punishment clause of the Eighth Amendment, never before announced, which is repugnant to the natural import of the language employed in the clause, and which interpretation curtails the legislative power of Congress to define and punish crime by asserting a right of judicial supervision over the exertion of that power, in disregard of the distinction between the legislative and judicial departments of the Government, I deem it my duty to dissent and state my reasons.

To perform this duty requires at the outset a precise statement of the construction given by the ruling now made to the provision of the Eighth Amendment.   My inability to do this must, however, be confessed, because I find it impossible to fix with precision the meaning which the court gives to that provision.   Not for the purpose of criticising, but solely in order to indicate my perplexity on the subject, the reasons for my doubt are briefly given.   Thus to my mind it appears as follows: First. That the court interprets the inhibition against cruel and unusual punishment as imposing upon Congress the duty of proportioning punishment according to the nature of the crime, and casts upon the judiciary the duty of determining whether punishments have been properly apportioned in a particular statute, and if not to decline to enforce it.   This seems to me to be the case, because of the reference made by the court to the harshness of the principal punishment (imprisonment), and its comments as to what it deems to be the severity, if not inhumanity, of the accessories which result from or accompany it, and the declaration in substance that these things offend against the just principle of proportioning punishment to the nature of the crime punished, stated to be a

fundamental precept of justice and of American criminal law.
That this is the view now upheld, it seems to me, is addi-
tionally demonstrated by the fact that the punishment for the
crime in question as imposed by the Philippine law is com-
pared with other Philippine punishments for crimes deemed
to be less heinous, and the conclusion is deduced that this fact
in and of itself serves to establish that the punishment imposed
in this case is an exertion of unrestrained power condemned by
the cruel and unusual punishment clause.

Second. That this duty of apportionment compels not only
that the lawmaking power should adequately apportion pun-
ishment for the crimes as to which it legislates, but also further
exacts that the performance of the duty of apportionment
must be discharged by taking into view the standards, whether
lenient or severe, existing in other and distinct jurisdictions,
and that a failure to do so authorizes the courts to consider
such standards in their discretion and judge of the validity of
the law accordingly. I say this because, although the court
expressly declares in the opinion, when considering a case de-
cided by the highest court of one of the Territories of the Uni-
ted States, that the legislative power to define and punish
crime committed in a Territory, for the purpose of the Eighth
Amendment, is separate and distinct from the legislation of
Congress, yet in testing the validity of the punishment affixed
by the law here in question, proceeds to measure it not alone
by the Philippine legislation, but by the provisions of several
acts of Congress punishing crime and in substance declares
such Congressional laws to be a proper standard, and in effect
holds that the greater proportionate punishment inflicted by
the Philippine law over the more lenient punishments pre-
scribed in the laws of Congress establishes that the Philippine
law is repugnant to the Eighth Amendment.

Third. That the cruel and unusual punishment clause of
the Eighth Amendment controls not only the exertion of
legislative power as to modes of punishment, proportionate
or otherwise, but addresses itself also to the mainspring of the

legislative motives in enacting legislation punishing crime in a particular case, and therefore confers upon courts the power to refuse to enforce a particular law defining and punishing crime if in their opinion such law does not manifest that the lawmaking power, in fixing the punishment, was sufficiently impelled by a purpose to effect a reformation of the criminal. This is said because of the statements contained in the opinion of the court as to the legislative duty to shape legislation not only with a view to punish but to reform the criminal, and the inferences which I deduce that it is conceived that the failure to do so is a violation of constitutional duty.

Fourth. That the cruel and unusual punishment clause does not merely limit the legislative power to fix the punishment for crime by excepting out of that authority the right to impose bodily punishments of a cruel kind, in the strict acceptation of those terms, but limits the legislative discretion in determining to what degree of severity an appropriate and usual mode of punishment may in a particular case be inflicted, and therefore endows the courts with the right to supervise the exercise of legislative discretion as to the adequacy of punishment, even although resort is had only to authorized kinds of punishment, thereby endowing the courts with the power to refuse to enforce laws punishing crime if in the judicial judgment the legislative branch of the Government has prescribed a too severe punishment.

Not being able to assent to these, as it to me seems, in some respects conflicting, or at all events widely divergent propositions, I shall consider them all as sanctioned by the interpretation now given to the prohibition of the Eighth Amendment, and with this conception in mind shall consider the subject.

Before approaching the text of the Eighth Amendment to determine its true meaning let me briefly point out why in my opinion it cannot have the significance which it must receive to sustain the propositions rested upon it. In the first place, if it be that the lawmaker in defining and punishing crime is imperatively restrained by constitutional provisions to apportion

punishment by a consideration alone of the abstract heinousness of the offenses punished, it must result that the power is so circumscribed as to be impossible of execution, or at all events is so restricted as to exclude the possibility of taking into account in defining and punishing crime all those considerations concerning the condition of society, the tendency to commit the particular crime, the difficulty of detecting the same, the necessity for resorting to stern measures of repression, and various other subjects which have at all times been deemed essential to be weighed in defining and punishing crime. And certainly the paralysis of the discretion vested in the lawmaking authority which the propositions accomplish is immeasurably magnified when it is considered that this duty of proportioning punishment requires the taking into account of the standards prevailing in other or different countries or jurisdictions, thereby at once exacting that legislation on the subject of crime must be proportioned, not to the conditions to which it is intended to apply, but must be based upon conditions with which the legislation when enacted will have no relation or concern whatever. And when it is considered that the propositions go further and insist that if the legislation seems to the judicial mind not to have been sufficiently impelled by motives of reformation of the criminal, such legislation defining and punishing crime is to be held repugnant to constitutional limitations, the impotency of the legislative power to define and punish crime is made manifest. When to this result is added the consideration that the interpretation by its necessary effect does not simply cause the cruel and unusual punishment clause to carve out of the domain of legislative authority the power to resort to prohibited kinds of punishments, but subjects to judicial control, the degree of severity with which authorized modes of punishment may be inflicted, it seems to me that the demonstration is conclusive that nothing will be left of the independent legislative power to punish and define crime, if the interpretation now made be pushed in future application to its logical conclusion.

But let me come to the Eighth Amendment, for the purpose of stating why the clause in question does not, in my opinion, authorize the deductions drawn from it, and therefore does not sanction the ruling now made.

I shall consider the Amendment *a*, as to its origin in the mother country and the meaning there given to it prior to the American Revolution; *b*, its migration and existence in the States after the Revolution and prior to the adoption of the Constitution; *c*, its incorporation into the Constitution and the construction given to it in practice from the beginning to this time; and, *d*, the judicial interpretation which it has received, associated with the construction affixed, both in practice and judicially, to the same provision found in various state constitutions or bills of rights.

Without going into unnecessary historical detail, it is sufficient to point out, as did the court in *In re Kemmler*, 136 U. S. 436, 446, that "the provision in reference to cruel and unusual punishments was taken from the well-known act of Parliament of 1688, entitled An act declaring the rights and liberties of the subject and settling the succession of the crown." And this act, it is to be observed, was but in regular form a crystallization of the declaration of rights of the same year. Hallam, Const. Hist., vol. 3, p. 106. It is also certain, as declared in the *Kemmler case*, that "this declaration of rights had reference to the acts of the executive and judicial departments of the government of England," since it but embodied the grievances which it was deemed had been suffered by the usurpations of the crown and transgressions of authority by the courts. In the recitals, both in the declaration of rights and the bill of rights, the grievances complained of were that illegal and cruel punishments had been inflicted, "which are utterly and directly contrary to the known laws and statutes and freedom of this realm," while in both the declaration and the bill of rights the remedy formulated was a declaration against the infliction of cruel and unusual punishments.

Whatever may be the difficulty, if any, in fixing the mean-

ing of the prohibition at its origin, it may not be doubted, and indeed is not questioned by any one, that the cruel punishments against which the bill of rights provided were the atrocious, sanguinary and inhuman punishments which had been inflicted in the past upon the persons of criminals. This being certain, the difficulty of interpretation, if any is involved, in determining what was intended by the unusual punishments referred to and which were provided against. Light, however, on this subject is at once afforded by observing that the unusual punishments provided against were responsive to and obviously considered to be the illegal punishments complained of. These complaints were, first, that customary modes of bodily punishments, such as whipping and the pillory, had, under the exercise of judicial discretion, been applied to so unusual a degree as to cause them to be illegal; and, second, that in some cases an authority to sentence to perpetual imprisonment had been exerted under the assumption that power to do so resulted from the existence of judicial discretion to sentence to imprisonment, when it was unusual, and therefore illegal, to inflict life imprisonment in the absence · of express legislative authority. In other words, the prohibitions, although conjunctively stated, were really disjunctive, and embraced as follows: a, Prohibitions against a resort to the inhuman bodily punishments of the past; b, or, where certain bodily punishments were customary, a prohibition against their infliction to such an extent as to be unusual and consequently illegal; c, or the infliction, under the assumption of the exercise of judicial discretion, of unusual punishments not bodily which could not be imposed except by express statute, or which were wholly beyond the jurisdiction of the court to impose.

The scope and power of the guarantee as we have thus stated it will be found portrayed in the reasons assigned by the members of the House of Lords who dissented against two judgments for perjury entered in the King's Bench against Titus Oates. 10 Howell's State Trials, col. 1325.

The judgments and the dissenting reasons are copied in the margin.[1]

As well the dissent referred to as the report of the conferees

---

[1] Judgment against Titus Oates upon conviction upon two indictments for perjury, as announced by the court, (10 Howell's State Trials, col. 1316–1317 & 1325).

"First, The Court does order for a fine, that you pay 1000 marks upon each Indictment.

"Secondly, That you be stript of all your Canonical Habits.

"Thirdly, The Court does award, That you do stand upon the Pillory, and in the Pillory, here before Westminster-hall gate, upon Monday next, for an hour's time, between the hours of 10 and 12; with a paper over your head (which you must first walk with round about to all the Courts in Westminster-hall) declaring your crime. And that is upon the first Indictment.

"Fourthly, (on the Second Indictment), upon Tuesday, you shall stand upon, and in the Pillory, at the Royal Exchange in London, for the space of an hour, between the hours of twelve and two; with the same inscription.

"You shall upon the next Wednesday be whipped from Aldgate to Newgate.

"Upon Friday, you shall be whipped from Newgate to Tyburn, by the hands of the common hangman.

"But, Mr. Oates, we cannot but remember, there were several particular times you swore false about; and therefore, as annual commemorations, that it may be known to all people as long as you live, we have taken special care of you for an annual punishment.

"Upon the 24th of April every year, as long as you live, you are to stand upon the Pillory and in the Pillory, at Tyburn, just opposite to the gallows, for the space of an hour, between the hours of ten and twelve.

"You are to stand upon, and in the Pillory, here at Westminster-hall gate, every 9th of August, in every year, so long as you live. And that it may be known what we mean by it, 'tis to remember, what he swore about Mr. Ireland's being in town between the 8th and 12th of August.

"You are to stand upon, and in the Pillory, at Charing-cross, on the 10th of August, every year, during your life, for an hour, between ten and twelve.

"The like over-against the Temple gate, upon the 11th.

"And upon the 2d of September, (which is another notorious time,

on the part of the House of Commons, made to that body concerning a bill to set aside the judgments against Oates above referred to, (Cobbett's Parl. History, vol. V, col. 386), proceeded upon the identity of what was deemed to be the illegal practises complained of and which were intended to be rectified by the prohibition against cruel and unusual punishments

which you cannot but be remember'd of) you are to stand upon, and in the Pillory, for the space of one hour, between twelve and two, at the Royal Exchange; and all this you are to do every year, during your life; and to be committed close prisoner, as long as you live."

Dissenting statement of a minority of the House of Lords:

"1. For that the king's bench, being a temporal court, made it part of the judgment, that Titus Oates, being a clerk, should for his said perjuries, be divested of his canonical and priestly habit, and to continue divested all his life; which is a matter wholly out of their power, belonging to the ecclesiastical courts only.

"2. For that the said judgments are barbarous, inhuman, and unchristian; and there is no precedents to warrant the punishments of whipping and committing to prison for life, for the crime of perjury; which yet were but part of the punishments inflicted upon him.

"3. For that the particular matters upon which the indictments were found, were the points objected against Mr. Titus Oates' testimony in several of the trials, in which he was allowed to be a good and credible witness, though testified against him by most of the same persons, who witnessed against him upon those indictments.

"4. For that this will be an encouragement and allowance for giving the like cruel, barbarous, and illegal judgments hereafter, unless this judgment be reversed.

"5. Because sir John Holt, sir Henry Pollexfen, the two chief justices, and sir Robert Atkins chief baron, with six judges more (being all that where then present); for these and many other reasons, did, before us, solemnly deliver their opinions, and unanimously declare, That the said judgments were contrary to law and ancient practice, and therefore erroneous, and ought to be reversed.

"6. Because it is contrary to the declaration on the twelfth of February last, which was ordered by the Lords Spiritual and Temporal and Commons then assembled, and by their declaration engrossed in parchment, and enrolled among the records of parliament, and recorded in chancery; whereby it doth appear, that excessive bail ought not to be required, nor excessive fines imposed, nor cruel nor unusual punishments inflicted."

made in the declaration of rights, and treated that prohibition, as already stated, as substantially disjunctive, and as forbidding the doing of the things we have above enumerated. See, for the disjunctive character of the provision, Stephen, Comm. Law of England, 15th ed., p. 379.

When the origin and purpose of the declaration and the bill of rights is thus fixed it becomes clear that that declaration is not susceptible of the meaning now attributed to the same language found in the Constitution of the United States. That in England it was nowhere deemed that any theory of proportional punishment was suggested by the bill of rights or that a protest was thereby intended against the severity of punishments, speaking generally, is demonstrated by the practise which prevailed in England as to punishing crime from the time of the bill of rights to the time of the American Revolution. Speaking on this subject, Stephen, in his history of the criminal law of England, vol. 1, pp. 470–471, says:

"The severity of the criminal law was greatly increased all through the eighteenth century by the creation of new felonies without benefit of clergy. . . . However, after making all deductions on these grounds, there can be no doubt that the legislation of the eighteenth century in criminal matters was severe to the highest degree, and destitute of any sort of principle or system."

For the sake of brevity a review of the practises which prevailed in the colonial period will not be referred to. Therefore, attention is at once directed to the express guarantees in certain of the state constitutions adopted after the Declaration of Independence and prior to the formation of the Constitution of the United States, and the circumstances connected with the subsequent adoption of the Eighth Amendment.

In 1776, Maryland, in a bill of rights declared (1 Charters and Constitutions, pp. 818, 819):

"XIV. That sanguinary laws ought to be avoided, as far as is consistent with the safety of the State; and no law to inflict

cruel and unusual pains and penalties ought to be made in any case, or at any time hereafter."

"XXII. That excessive bail ought not to be required, nor excessive fines imposed, nor cruel or unusual punishments inflicted, by the courts of law."

. The constitution of North Carolina of 1776 in general terms prohibited the infliction of "cruel or unusual punishments."

Virginia, by § 9 of the bill of rights adopted in 1776, provided as follows:

"That excessive bail ought not to be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

In the Massachusetts declaration of rights of 1780 a direct prohibition was placed upon the infliction by magistrates or courts of cruel or unusual punishments, the provision being as follows:

"ART. XXVI. No magistrate or court of law shall demand excessive bail or sureties, impose excessive fines, or inflict cruel or unusual punishments."

The declaration of rights of New Hampshire of 1784, was as follows:

"XVIII. All penalties ought to be proportioned to the nature of the offense. No wise legislature will affix the same punishment to the crimes of theft, forgery and the like, which they do to those of murder and treason; where the same undistinguishing severity exerted is against all offenses; the people are led to forget the real distinction in the crimes themselves, and to commit the most flagrant with as little compunction as they do those of the lightest dye: For the same reason a multitude of sanguinary laws is both impolitic and unjust. The true design of all punishments being to reform, not to exterminate, mankind."

· "XXXIII. No magistrate or court of law shall demand excessive bail or sureties, impose excessive fines, or inflict cruel or unusual punishments."

The substantial identity between the provisions of these several constitutions or bills of rights shows beyond doubt that

their meaning was understood, that is to say, that the significance attributed to them in the mother country as the result of the bill of rights of 1689 was appreciated, and that it was intended in using the identical words to give them the same well-understood meaning.  It is to be observed that the New Hampshire bill of rights contains a clause admonishing as to the wisdom of the apportionment of punishment of crime according to the nature of the offense, but in marked contrast to the reënactment, in express and positive terms, of the cruel and unusual punishment clause of the English bill of rights, the provision as to apportionment is merely advisory, additionally demonstrating the precise and accurate conception then entertained of the nature and character of the prohibition adopted from the English bill of rights.

Undoubtedly, in the American States, prior to the formation of the Constitution, the necessity for the protection afforded by the cruel and unusual punishment guarantee of the English bill of rights had ceased to be a matter of concern, because as a rule the cruel bodily punishments of former times were no longer imposed, and judges, where moderate bodily punishment was usual, had not, under the guise of discretion, directed the infliction of such punishments to so unusual a degree as to transcend the limits of discretion and cause the punishment to be illegal, and had also not attempted, in virtue of mere discretion, to inflict such unusual and extreme punishments as had always been deemed proper to be inflicted only as the result of express statutory authority.  Despite these considerations, it is true that some of the solicitude which arose after the submission of the Constitution for ratification, and which threatened to delay or prevent such ratification, in part at least was occasioned by the failure to guarantee against the infliction of cruel and unusual punishments.  Thus, in the Massachusetts convention, Mr. Holmes, discussing the general result of the judicial powers conferred by the Constitution and referring to the right of Congress to define and fix the punishment for crime, said (2 El. Deb. 111):

"They are nowhere restrained from inventing the most cruel and unheard-of punishments, and annexing them to crimes; and there is no constitutional check on them, but that *racks* and *gibbets* may be amongst the most mild instruments of their discipline."

That the opposition to the ratification in the Virginia convention was earnestly and eloquently voiced by Patrick Henry is too well known to require anything but statement. That the absence of a guarantee against cruel and unusual punishment was one of the causes of the solicitude by which Henry was possessed is shown by the debates in that convention. Thus Patrick Henry said (3 El. Deb. 447):

"In this business of legislation, your members of Congress will lose the restriction of not imposing excessive fines, demanding excessive bail, and inflicting cruel and unusual punishments. These are prohibited by your declaration of rights. What has distinguished our ancestors? That they would not admit of tortures, or cruel and barbarous punishment. But Congress may introduce the practice of the civil law, in preference to that of the common law. They may introduce the practice of France, Spain and Germany—of torturing, to extort a confession of the crime. They will say that they might as well draw examples from those countries as from Great Britain, and they will tell you that there is such a necessity of strengthening the arm of government that they must have a criminal equity, and extort confession by torture, in order to punish with still more relentless severity. We are then lost and undone. And can any man think it troublesome when we can by a small interference prevent our rights from being lost? If you will, like the Virginian government, give them knowledge of the extent of the rights retained by the people, and the powers of themselves, they will, if they be honest men, thank you for it. Will they not wish to go on sure grounds? But, if you leave them otherwise, they will not know how to proceed; and, being in a state of uncertainty, they will assume rather than give up powers by implication."

These observations, it is plainly to be seen, were addressed to the fear of the repetition either by the sanction of law or by the practice of courts, of the barbarous modes of bodily punishment or torture, the protest against which was embodied in the bill of rights in 1689.

The ultimate recognition by Henry of the patriotic duty to ratify the Constitution and trust to the subsequent adoption of a bill of rights, the submission and adoption of the first ten amendments as a bill of rights which followed ratification, the connection of Mr. Madison with the drafting of the amendments, and the fact that the Eighth Amendment is in the precise words of the guarantee on that subject in the Virginia bill of rights, would seem to make it perfectly clear that it was only intended by that Amendment to remedy the wrongs which had been provided against in the English bill of rights, and which were likewise provided against in the Virginia provision, and therefore were intended to guard against the evils so vividly portrayed by Henry in the debate which we have quoted. That this was the common understanding which must have existed on the subject is plainly to be inferred from the fact that the Eighth Amendment was substantially submitted by Congress without any debate on the subject. 2 Elliot's Deb. 225. Of course, in view of the nature and character of the government which the Constitution called into being, the incorporation of the Eighth Amendment caused its provisions to operate a direct and controlling prohibition upon the legislative branch (as well as all other departments), restraining it from authorizing or directing the infliction of the cruel bodily punishments of the past, which was one of the evils sought to be prevented for the future by the English bill of rights, and also restrained the courts from exerting and Congress from empowering them to select and exert by way of discretion modes of punishment which were not usual, or usual modes of punishment to a degree not usual and which could alone be imposed by express authority of law. But this obvious result lends no

support to the theory that the adoption of the Amendment operated or was intended to prevent the legislative branch of the Government from prescribing, according to its conception of what public policy required, such punishments, severe or otherwise, as it deemed necessary for the prevention of crime, provided only resort was not had to the infliction of bodily punishments of a cruel and barbarous character against which the Amendment expressly provided. Not to so conclude is to hold that because the Amendment in addition to depriving the lawmaking power of the right to authorize the infliction of cruel bodily punishments had restricted the courts, where discretion was possessed by them, from exerting the power to punish by a mode or in a manner so unusual as to require legislative sanction, it thereby deprived Congress of the power to sanction the punishments which the Amendment forbade being imposed merely because they were not sanctioned. In other words, that because the power was denied to the judiciary to do certain things without legislative authority, thereby the right on the part of the legislature to confer the authority was taken away. And this impossible conclusion would lead to the equally impossible result that the effect of the Amendment was to deprive Congress of its legitimate authority to punish crime, by prescribing such modes of punishment, even although not before employed, as were appropriate for the purpose.

That no such meaning as is now ascribed to the Amendment was attributed to it at the time of its adoption is shown by the fact that not a single suggestion that it had such a meaning is pointed to, and that on the other hand the practise from the very beginning shows directly to the contrary and demonstrates that the very Congress that adopted the Amendment construed it in practice as I have construed it. This is so, since the first crimes act of the United States prescribed a punishment for crime utterly without reference to any assumed rule of proportion or of a conception of a right in the judiciary to supervise the action of Congress in respect to

the severity of punishment, excluding always the right to impose as a punishment the cruel bodily punishments which were prohibited. What clearer demonstration can there be of this than the statement made by this court in *Ex parte Wilson*, 114 U. S. 427, of the nature of the first crimes act, as follows:

"By the first Crimes Act of the United States, forgery of public securities, or knowingly uttering forged public securities with intent to defraud, as well as treason, murder, piracy, mutiny, robbery, or rescue of a person convicted of a capital crime, was punishable with death; most other offences were punished by fine and imprisonment; whipping was part of the punishment of stealing or falsifying records, fraudulently acknowledging bail, larceny of goods, or receiving stolen goods; disqualification to hold office was part of the punishment of bribery; and those convicted of perjury or subornation of perjury, besides being fined and imprisoned, were to stand in the pillory for one hour, and rendered incapable of testifying in any court of the United States. Act of April 30, 1790, ch. 9; 1 Stat. 112–117; Mr. Justice Wilson's Charge to the Grand Jury in 1791, 3 Wilson's Works, 380, 381."

And it is, I think, beyond power even of question that the legislation of Congress from the date of the first crimes act to the present time but exemplifies the truth of what has been said, since that legislation from time to time altered modes of punishment, increasing or diminishing the amount of punishment as was deemed necessary for the public good, prescribing punishments of a new character, without reference to any assumed rule of apportionment or the conception that a right of judicial supervision was deemed to obtain. It is impossible with any regard for brevity to demonstrate these statements by many illustrations. But let me give a sample from legislation enacted by Congress of the change of punishment. By § 14 of the first crimes act (Art. April 30, 1790, ch. 9, 1 Stat. 115), forgery, etc., of the public securities of the United States, or the knowingly ut-

tering and offering for sale of forged or counterfeited securities of the United States with intent to defraud, was made punishable by death. The punishment now is a fine of not more than $5,000, and imprisonment at hard labor for not more than fifteen years. Rev. Stat., § 5414.

By the first crimes act also, as in numerous others since that time, various additional punishments for the commission of crime were imposed, prescribing disqualification to hold office, to be a witness in the courts, etc., and as late as 1865 a law was enacted by Congress which prescribed as a punishment for crime the disqualification to enjoy rights of citizenship. Rev. Stat., §§ 1996, 1997, 1998.

Comprehensively looking at the rulings of this court,[1] it may be conceded that hitherto they have not definitely interpreted the precise meaning of the clause in question, because in most of the cases in which the protection of the Amendment has been invoked the cases came from courts of last resort of States, and the opinions leave room for the contention that they proceeded upon the implied assumption that the Eighth Amendment did not govern the States by virtue of the adoption of the Fourteenth Amendment. However, in *Wilkerson* v. *Utah*, 99 U. S. 130, a case coming to this court from the Territory of Utah, the meaning of the clause of the Eighth Amendment in question came directly under review. The question for decision was whether a sentence to death by shooting, which had been imposed by the court under the assumed exercise of a discretionary power to fix the mode of execution of the sentence, was repugnant to the clause. While the court in deciding that it was not, did not undertake to fully interpret the meaning of the clause, it nevertheless, reasoning by exclusion, expressly negatived the construction now placed upon it. It was said (pp. 135–136):

---

[1] *Pervear* v. *Massachusetts*, 5 Wall. 475; *Wilkerson* v. *Utah*, 99 U. S. 130; *In re Kemmler*, 136 U. S. 436; *McElvaine* v. *Brush*, 142 U. S. 155; *Howard* v. *Fleming*, 191 U. S. 126.

"Difficulty would attend the effort to define with exactness the extent of the constitutional provision which provides that cruel and unusual punishments shall not be inflicted; but it is safe to affirm that punishments of torture, such as those mentioned by the commentator referred to, and all others in the same line of unnecessary cruelty, are forbidden by that amendment to the Constitution. Cooley, Const. Lim. (4th ed.), 408; Wharton, Cr. L. (7th ed.), sec. 3405."

And it was doubtless this ruling which caused the court subsequently to say in *In re Kemmler*, 136 U. S. 436, 447:

"Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel, within the meaning of that word as used in the Constitution. It implies there something inhuman and barbarous, something more than the mere extinguishment of life."

Generally viewing the action of the States in their bills of right as to the prohibition against inhuman or cruel and unusual punishments, it is true to say that those provisions substantially conform to the English bill of rights and to the provision of the Eighth Amendment we are considering, some using the expression cruel and unusual, others the more accurate expression cruel or unusual, and some cruel only, and in a few instances a provision requiring punishments to be proportioned to the nature of the offense is added to the inhibition against cruel and unusual punishments. In one (Illinois) the prohibition against cruel and unusual punishments is not expressed, although proportional punishment is commanded, yet in *Kelley* v. *The People*, 115 Illinois, 583, discussing the extent of punishment inflicted by a criminal statute, the Supreme Court of Illinois declared that "it would not be for the court to say the penalty was not proportioned to the nature of the offense." In another State (Ohio) where in the early constitution of the State proportionate punishment was conjoined with the cruel and unusual punishment provision, the proportionate provision was omitted in a later constitution.

Here, again, it is true to say, time forbidding my indulg-
ing in a review of the statutes, that the legislation of all the
States is absolutely in conflict with and repugnant to the
construction now given to the clause. since that legislation
but exemplifies the exertion of legislative power to define
and punish crime according to the legislative conception of
the necessities of the situation, without the slightest indica-
tion of the assumed duty to proportion punishments, and
without the suggestion of the existence of judicial power to
control the legislative discretion, provided only that the
cruel bodily punishments forbidden were not resorted to.
And the decisions of the state courts of last resort, it seems
to me, with absolute uniformity and without a single excep-
tion from the beginning, proceed upon this conception. It is
true that when the reasoning employed in the various cases
is critically examined a difference of conception will be mani-
fested as to the occasion for the adoption of the English bill
of rights and of the remedy which it provided. Generally
speaking, when carefully analyzed, it will be seen that this
difference was occasioned by treating the provision against
cruel and unusual punishment as conjunctive instead of dis-
junctive, thereby overlooking the fact, which I think has
been previously demonstrated to be the case, that the term
unusual, as used in the clause, was not a qualification of the
provision against cruel punishments, but was simply synony-
mous with illegal, and was mainly intended to restrain the
courts, under the guise of discretion, from indulging in an
unusual and consequently illegal exertion of power. Certain
it is, however, whatever may be these differences of reason-
ing, there stands out in bold relief in the State cases, as it is
given to me to understand them, without a single exception,
the clear and certain exclusion of any prohibition upon the
lawmaking power to determine the adequacy with which
crime shall be punished, provided only the cruel bodily pun-
ishments of the past are not resorted to. Let me briefly re-
fer to some of the cases.

In *Aldridge* v. *Commonwealth*, 2 Va. Cas. 447, decided about twenty years after the ratification of the Eighth Amendment, speaking concerning the evils to which the guarantee of the Virginia bill of rights against cruel and unusual punishments was addressed, the court, after referring to the punishments usually applicable in that State to crime at the time of the adoption of the bill of rights of Virginia, said (p. 450):

"We consider these sanctions as sufficiently rigorous, and we knew that the best heads and hearts of the land of our ancestors had long and loudly declaimed against the wanton cruelty of many of the punishments practiced in other countries; and this section in the bill of rights was framed effectually to exclude these, so that no future legislature, in a moment perhaps of great and general excitement, should be tempted to disgrace our code by the introduction of any of those odious modes of punishment."

And, four years later, in 1828, applying the same doctrine in *Commonwealth* v. *Wyatt*, 6 Rand. 694, where a punishment by whipping was challenged as contrary to the Virginia bill of rights, the court said (p. 700): "The punishment of offenses by stripes is certainly odious, but cannot be said to be unusual."

Until 1865 there was no provision in the constitution of Georgia expressly guaranteeing against cruel and unusual punishments. The constitution of that year, however, contained a clause identical in terms with the Eighth Amendment, and the scope of the guarantee arose for decision in 1872 in *Whitten* v. *State*, 47 Georgia, 297. The case was this: Upon a conviction for assault and battery Whitten had been sentenced to imprisonment or the payment of a fine of $250 and costs. The contention was that this sentence was so disproportionate to the offense committed as to be cruel and unusual and repugnant to the guarantee. In one of its immediate aspects the case involved the guarantee against excessive fines, but as the imprisonment was the coercive means for the payment of the fine, in that aspect the case

involved the cruel and unusual punishment clause, and the court so considered, and, in coming to interpret the clause said (p. 301):

"Whether the law is unconstitutional, a violation of that article of the Constitution which declares excessive fines shall not be imposed nor cruel and unusual punishments inflicted, is another question. The latter clause was, doubtless, intended to prohibit the barbarities of quartering, hanging in chains, castration, etc. When adopted by the framers of the Constitution of the United States, larceny was generally punished by hanging; forgeries, burglaries, etc., in the same way, for, be it remembered, penitentiaries are of modern origin, and I doubt if it ever entered into the mind of men of that day that a crime such as this witness makes the defendant guilty of deserved a less penalty than the judge has inflicted. It would be an interference with matters left by the Constitution to the legislative department of the government for us to undertake to weigh the propriety of this or that penalty fixed by the legislature for specific offenses. So long as they do not provide cruel and unusual punishments, such as disgraced the civilization of former ages, and made one shudder with horror to read of them, as drawing, quartering, burning, etc., the Constitution does not put any limit upon legislative discretion."

In *State* v. *White* (1890), 44 Kansas, 514, it was sought to reverse a sentence of five years' imprisonment in the penitentiary, imposed upon a boy of sixteen for statutory rape. The girl was aged sixteen, and had consented. It was contended that if the statute applied it was unconstitutional and void, "for the reason that it conflicts with section 9 of the bill of rights, because it inflicts cruel and unusual punishment, and is in conflict with the spirit of the bill of rights generally, and is in violation of common sense, common reason, and common justice."

The court severely criticised the statute. After deciding that the offense was embraced in the statute, the court said:

"With respect to the severity of the punishment, while we think it is true that it is a severer one than has ever before been provided for in any other State or county for such an offense, yet we cannot say that the statute is void for that reason.    Imprisonment in the penitentiary at hard labor is not of itself a cruel or unusual punishment; within the meaning of section 9 of the bill of rights of the Constitution, for it is a kind of punishment which has been resorted to ever since Kansas has had any existence, and is a kind of punishment common in all civilized countries.    That section of the Constitution probably, however, relates to the kind of punishment to be inflicted, and not to its duration.    Although the punishment in this case may be considered severe, and much severer indeed than the punishment for offenses of much greater magnitude, as adultery, or sexual intercourse coupled with seduction, yet we cannot say that the act providing for it is unconstitutional or void."

In *State* v. *Hogan* (1900), 63 Ohio St. 218, the court sustained a "tramp law," which prescribed, as the punishment to be imposed on a tramp for threatening to do injury to the person of another, imprisonment in the penitentiary not more than three years nor less than one year.    In the course of the opinion the court said:

"The objection that the act prescribes a cruel and unusual punishment we think not well taken.    Imprisonment at hard labor is neither cruel nor unusual.    It may be severe in the given instance, but that is a question for the lawmaking power. *In re Kemmler,* 136 U. S. 436; *Cornelison* v. *Com.,* 84 Kentucky, 583.    The punishment, to be effective, should be such as will prove a deterrent.    The tramp cares nothing for a jail sentence.    Often he courts it.    A workhouse sentence is less welcome, but there are but few workhouses in the State.    A penitentiary sentence is a real punishment.    There he has to work, and cannot shirk."

In Minnesota a register of deeds was convicted of misappropriating the sum of $62.50, which should have been turned

over by him to the county treasurer. He was sentenced to pay a fine of $500 and be imprisoned at hard labor for one year. The contention that the sentence was repugnant to the state constitutional guarantee against cruel and unusual punishment was considered and disposed of by the court in *State* v. *Borgstrom*, 69 Minnesota, 508, 520. Among other things the court said:

"It is claimed that the sentence imposed was altogether disproportionate to the offense charged, and of which the defendant was convicted, and comes within the inhibition of Const. art. 1, § 5, that no cruel or unusual punishments be inflicted. . . . We are not unmindful of the importance of this question, and have given to it that serious and thorough examination which such importance demands. . . . In England there was a time when punishment was by torture, by loading him with weights to make him confess. Traitors were condemned to be drowned, disemboweled, or burned. It was the 'law that the offender shall be drawn, or rather dragged, to the gallows; he shall be hanged and cut down alive; his entrails shall be removed and burned while he yet lives; his head shall be decapitated; his body divided into four parts.' \Browne, Bl. Comm. 617. For certain other offenses the offender was punished by cutting off the hands or ears, or boiling in oil, or putting in the pillory. By the Roman law a parricide was punished by being sewed up in a leather sack with a live dog, a cock, a viper, and an ape, and cast into the sea. These punishments may properly be termed cruel, but happily the more humane spirit of this nation does not permit such punishment to be inflicted upon criminals. Such punishments are not warranted by the laws of nature or society, and we find that they are prohibited by our Constitution. But, within this limitation or restriction, the legislature is ordinarily the judge of the expediency of creating new crimes and of prescribing the penalty. . . . While the amount of money misappropriated in this instance was not great, the legislature evidently had in mind the fact that the misappropriation by a

public official of the public money was destructive of the public rights and the stability of our government. But fine and imprisonment are not ordinarily cruel and unusual punishments. . . ."

In *Territory* v. *Ketchum*, 10 N. M. 721, the court considered whether a statute which had recently been put in force and which imposed the death penalty instead of a former punishment of imprisonment, for an attempt at train robbery, was cruel and unusual. In sustaining the validity of the law the court pointed out the conditions of society which presumably had led the lawmaking power to fix the stern penalty, and after a lengthy discussion of the subject it was held that the law did not impose punishment which was cruel or unusual.

The cases just reviewed are typical, and I therefore content myself with noting in the margin many others to the same general effect.[1]

In stating, as I have done, that in my opinion no case could be found sustaining the proposition which the court now

---

[1] Cases decided in state and territorial courts of last resort, involving the question whether particular punishments were cruel and unusual: *Ex parte Mitchel*, 70 California, 1; *People* v. *Clark*, 106 California, 32; *Fogarty* v. *State*, 80 Georgia, 450; *Kelley* v. *State*, 115 Illinois, 583; *Hobbs* v. *State*, 133 Indiana, 404; *State* v. *Teeters*, 97 Iowa, 458; *In re Tutt*, 55 Kansas, 705; *Cornelison* v. *Commonwealth*, 84 Kentucky, 583, 608; *Harper* v. *Commonwealth*, 93 Kentucky, 290; *State* v. *Baker*, 105 Louisiana, 378; *Foot* v. *State*, 59 Maryland, 264, 267; *Commonwealth* v. *Hitchings*, 5 Gray, 482; *McDonald* v. *Commonwealth*, 173 Massachusetts, 322; *Luton* v. *Newaygo Circuit Judge*, 69 Michigan, 610; *People* v. *Morris*, 80 Michigan, 637; *People* v. *Smith*, 94 Michigan, 644; *People* v. *Whitney*, 105 Michigan, 622; *Dummer* v. *Nungesser*, 107 Michigan, 481; *People* v. *Huntley*, 112 Michigan, 569; *State* v. *Williams*, 77 Missouri, 310; *Ex parte Swann*, 96 Missouri, 44; *State* v. *Moore*, 121 Missouri, 514; *State* v. *Van Wye*, 136 Missouri, 227; *State* v. *Gedicke*, 14 Vroom, 86; *Garcia* v. *Territory*, 1 N. M. 415; *State* v. *Apple*, 121 N. C. 584; *State* v. *Barnes*, 3 N. D. 319; *State* v. *Becker*, 3 S. D. 29; *State* v. *Hodgson*, 66 Vermont, 134; *State* v. *De Lane*, 80 Wisconsin, 259; *State* v. *Fackler*, 91 Wisconsin, 418; *In re MacDonald*, 4 Wyoming, 150.

holds, I am of course not unmindful that a North Carolina case (*State* v. *Driver*, 78 N. C. 432) is cited by the court as authority, and that a Louisiana case (*State ex rel. Garvey et al.* v. *Whitaker, Recorder*, 48 La. Ann. 527) is sometimes referred to as of the same general tenor. A brief analysis of the *Driver case* will indicate why in my opinion it does not support the contention based upon it. In that case the accused was convicted of assault and battery, and sentenced to imprisonment for five years in the county jail. The offense was a common-law misdemeanor, and the punishment not being fixed by statute, as observed by the court (page 429), was left to the discretion of the judge. In testing whether the term of the sentence was unusual and therefore illegal, the court held that a long term of imprisonment in the county jail was unlawful because unusual, and was a gross abuse by the lower court of its discretion. Although the court made reference to the constitutional guarantee, there is not the slightest indication in its opinion that it was deemed there would have been power to set aside the sentence had it been inflicted by virtue of an express statutory command. But this aside, it seems to me as the test applied in the *Driver case* to determine what was an unusual punishment in North Carolina was necessarily so local in character that it affords no possible ground here for giving an erroneous meaning to the Eighth Amendment. I say this because an examination of the opinion will disclose that it proceeded upon a consideration of the disadvantages peculiar to an imprisonment in a county jail in North Carolina as compared with the greater advantages to arise from the imprisonment for a like term in the penitentiary, the court saying:

"Now, it is true our terms of imprisonment are much longer, but they are in the penitentiary, where a man may live and be made useful; but a county jail is a close prison, where life is soon in jeopardy, and where the prisoner is not only useless but a heavy public expense."

As to the Louisiana case, I content myself with saying that it, in substance, involved merely the question of error com-

mitted by a magistrate in imposing punishment for many offenses when, under the law, the offense was a continuing and single one.

From all the considerations which have been stated I can deduce no ground whatever which to my mind sustains the interpretation now given to the cruel and unusual punishment clause. On the contrary, in my opinion, the review which has been made demonstrates that the word cruel, as used in the Amendment, forbids only the lawmaking power, in prescribing punishment for crime and the courts in imposing punishment from inflicting unnecessary bodily suffering through a resort to inhuman methods for causing bodily torture, like or which are of the nature of the cruel methods of bodily torture which had been made use of prior to the bill of rights of 1689, and against the recurrence of which the word cruel was used in that instrument. To illustrate. Death was a well-known method of punishment prescribed by law, and it was of course painful, and in that sense was cruel. But the infliction of this punishment was clearly not prohibited by the word cruel, although that word manifestly was intended to forbid the resort to barbarous and unnecessary methods of bodily torture, in executing even the penalty of death.

In my opinion the previous considerations also establish that the word unusual accomplished only three results: First, it primarily restrains the courts when acting under the authority of a general discretionary power to impose punishment, such as was possessed at common law, from inflicting lawful modes of punishment to so unusual a degree as to cause the punishment to be illegal because to that degree it cannot be inflicted without express statutory authority; second, it restrains the courts in the exercise of the same discretion from inflicting a mode of punishment so unusual as to be impliedly not within its discretion and to be consequently illegal in the absence of express statutory authority; and, third, as to both the foregoing it operated to restrain the lawmaking power from endowing the judiciary with the right to exert an illegal

discretion as to the kind and extent of punishment to be inflicted.

Nor is it given to me to see in what respect the construction thus stated minimizes the constitutional guarantee by causing it to become obsolete or ineffective in securing the purposes which led to its adoption. Of course, it may not be doubted that the provision against cruel bodily punishment is not restricted to the mere means used in the past to accomplish the prohibited result. The prohibition being generic, embraces all methods within its intendment. Thus, if it could be conceived that to-morrow the lawmaking power, instead of providing for the infliction of the death penalty by hanging, should command its infliction by burying alive, who could doubt that the law would be repugnant to the constitutional inhibition against cruel punishment? But while this consideration is obvious, it must be equally apparent that the prohibition against the infliction of cruel bodily torture cannot be extended so as to limit legislative discretion in prescribing punishment for crime by modes and methods which are not embraced within the prohibition against cruel bodily punishment, considered even in their most generic sense, without disregarding the elementary rules of construction which have prevailed from the beginning. Of course, the beneficent application of the Constitution to the ever-changing requirements of our national life has in a great measure resulted from the simple and general terms by which the powers created by the Constitution are conferred or in which the limitations which it provides are expressed. But this beneficent result has also essentially depended upon the fact that this court, while never hesitating to bring within the powers granted or to restrain by the limitations created all things generically within their embrace, has also incessantly declined to allow general words to be construed so as to include subjects not within their intendment. That these great results have been accomplished through the application by the court of the familiar rule that what is generically included in the words

employed in the Constitution is to be ascertained by consider-
ing their origin and their significance at the time of their
adoption in the instrument may not be denied (*Boyd* v. *United
States,* 116 U. S. 616, 624; *Kepner* v. *United States,* 195 U. S.
100, 124, 125), rulings which are directly repugnant to the
conception that by judicial construction constitutional limi-
tations may be made to progress so as to ultimately include
that which they were not intended to embrace, a principle
with which it seems to me the ruling now made is in direct
conflict, since by the interpretation now adopted two results
are accomplished: *a,* the clause against cruel punishments,
which was intended to prohibit inhumane and barbarous
bodily punishments, is so construed as to limit the discretion
of the lawmaking power in determining the mere severity with
which punishments not of the prohibited character may be
prescribed, and, *b,* by interpreting the word unusual adopted
for the sole purpose of limiting judicial discretion in order
thereby to maintain the supremacy of the lawmaking power,
so as to cause the prohibition to bring about the directly con-
trary result, that is, to expand the judicial power by endowing
it with a vast authority to control the legislative department
in the exercise of its discretion to define and punish crime.

But further than this, assuming for the sake of argument
that I am wrong in my view of the Eighth Amendment, and
that it endows the courts with the power to review the discre-
tion of the lawmaking body in prescribing sentence of im-
prisonment for crime, I yet cannot agree with the conclusion
reached in this case that because of the mere term of imprison-
ment it is within the rule. True, the imprisonment is at hard
and painful labor. But certainly the mere qualification of
painful in addition to hard cannot be the basis upon which it
is now decided that the legislative discretion was abused, since
to understand the meaning of the term requires a knowledge of
the discipline prevailing in the prisons in the Philippine Is-
lands. The division of hard labor into classes, one more irk-
some and it may be said more painful than the other in the

sense of severity, is well known. English Prisons Act of 1865, Pub. Gen. Stat., § 19, page 835. I do not assume that the mere fact that a chain is to be carried by the prisoner causes the punishment to be repugnant to the bill of rights, since while the chain may be irksome it is evidently not intended to prevent the performance of the penalty of hard labor. Such a provision may well be part of the ordinary prison discipline, particularly in communities where the jails are insecure, and it may be a precaution applied, as it is commonly applied in this country, as a means of preventing the escape of prisoners, for instance where the sentence imposed is to work on the roads or other work where escape might be likely. I am brought, then, to the conclusion that the accessory punishments are the basis of the ruling now made, that the legislative discretion was so abused as to cause it to be necessary to declare the law prescribing the punishment for the crime invalid. But I can see no foundation for this ruling, as to my mind these accessory punishments, even under the assumption, for the sake of argument, that they amounted to an abuse of legislative discretion, are clearly separable from the main punishment—imprisonment. Where a sentence is legal in one part and illegal in another it is not open to controversy that the illegal, if separable, may be disregarded and the legal enforced. *United States* v. *Pridgeon*, 153 U. S. 48. But it is said here the illegality is not merely in the sentence, but in the law which authorizes the sentence. Grant the premise. The illegal is capable of separation from the legal in the law as well as in the sentence, and because this is a criminal case it is none the less subject to the rule that where a statute is unconstitutional in part and in part not, the unconstitutional part, if separable, may be rejected and the constitutional part maintained. Of course it is true that that can only be done provided it can be assumed that the legislature would have enacted the legal part separate from the illegal. The ruling now made must therefore rest upon the proposition that because the law has provided an illegal in addition to a legal punish-

ment it must be assumed that the legislature would not have defined and punished the crime to the legal extent, because to some extent the legislature was mistaken as to its powers. But this I contend is to indulge in an assumption which is unwarranted and has been directly decided to the contrary at this term in *United States* v. *Union Supply Company,* 215 U. S. 50. In that case a corporation was proceeded against criminally for an offense punishable by imprisonment and fine. The corporation clearly could not be subjected to the imprisonment, and the contention was that the lawmaker must be presumed to have intended that both the punishments should be inflicted upon the person violating the law, and therefore it could not be intended to include a corporation within its terms. In overruling the contention it was said (p. 55):

"And if we free our minds from the notion that criminal statutes must be construed by some artificial and conventional rule, the natural inference, when a statute prescribes two independent penalties, is that it means to inflict them so far as it can, and that if one of them is impossible, it does not mean on that account to let the defendant escape."

I am authorized to say that MR. JUSTICE HOLMES concurs in this dissent.