PRESIDING JUSTICE APPLETON, dissenting: I respectfully dissent from the majority’s decision. I would reverse the trial court’s judgment, and remand this case for a new trial, for two reasons. First, the evidence was closely balanced and failing to hold a Boose hearing was plain error. Second, section 5 — 101(3) of the Act (705 ILCS 405/5 — 101(3) (West 2004)), as applied to juveniles charged with sex offenses, is unconstitutional because it denies juveniles the right to a jury trial. A. The Unnecessary Shackling of Respondent The supreme court has said that requiring a defendant to wear shackles during trial without a strong necessity for the shackling jeopardizes the value and protection of the presumption of innocence. In re Staley, 67 Ill. 2d 33, 37, 364 N.E.2d 72, 73 (1977). If the only reason a defendant is in shackles is the alleged offense for which he is on trial, he justifiably would feel skeptical if the court happened to mention to him that he was presumed innocent until proved guilty. Any sensible person in his position would regard such a statement as pro forma hypocrisy. “Every accused person *** enters upon his trial clothed with the presumption of innocence.” Yee Hem v. United States, 268 U.S. 178, 184, 69 L. Ed. 904, 906, 45 S. Ct. 470, 472 (1925). But in the circuit court of Champaign County, defendants wear chains as a seeming matter of course. See Barney, 363 Ill. App. 3d at 592, 844 N.E.2d at 83 (appeal from Champaign County, in which we discussed the requirements of Boose). Like the defense counsel in Barney, defense counsel in this case never objected. We held in Barney, 363 Ill. App. 3d at 596, 844 N.E.2d at 86, that “plain error does not automatically occur when shackles are used without a Boose hearing.” It does not follow that unnecessary shackling can never be plain error. The supreme court has held that a defendant can prove plain error in two alternative ways: “First, where the evidence in a case is so closely balanced that the jury’s guilty verdict may have resulted from the error and not the evidence, a reviewing court may consider a forfeited error in order to preclude an argument that an innocent person was wrongly convicted. [Citation.] Second, where the error is so serious that the defendant was denied a substantial right, and thus a fair trial, a reviewing court may consider a forfeited error in order to preserve the integrity of the judicial process. [Citations.] This so-called disjunctive test does not offer two divergent interpretations of plain error, but instead two different ways to ensure the same thing — namely, a fair trial.” People v. Herron, 215 Ill. 2d 167, 178-79, 830 N.E.2d 467, 475 (2005). Before deciding whether plain error occurred, it is logical to consider whether any error at all occurred. People v. Hudson, 228 Ill. 2d 181, 191, 886 N.E.2d 964, 971 (2008). (I note that at oral argument, counsel for the State asserted that the record did not disclose that the trial court was aware respondent was shackled during the proceedings prior to his testimony. Whether or not skirting at the counsel table existed, given that the trial court directed that the shackles be removed from respondent during his testimony from the witness stand would seem to imply that the trial court was in a position to observe respondent’s shackling prior to that time.) The majority cites decisions holding that unless a defendant objected to being shackled, the shackling violated no constitutional right because the State never compelled the defendant to be shackled. Hyche, 77 Ill. 2d at 241, 396 N.E.2d at 12; Strickland, 363 Ill. App. 3d at 605, 843 N.E.2d at 903. It is beyond belief that just because defense counsel fails to object, the defendant is wearing shackles by his own free choice. The more likely explanation is that defense counsel assumed an objection would be futile because routine shackling is the modus operandi. In any event, the supreme court apparently no longer subscribes to the rather facile no-objection, no-compulsion rationale of Hyche. In People v. Allen, 222 Ill. 2d 340, 353-54, 856 N.E.2d 349, 357 (2006), the supreme court held that even though the defendant never objected to wearing an electric stun belt during trial, “the failure to conduct a Boose hearing *** [was] an error,” a “due[-]process violation” (Allen, 222 Ill. 2d at 353, 856 N.E.2d at 356). Therefore, I infer that the failure to object to shackles does not negate the error of failing to hold a Boose hearing. The supreme court concluded in Allen, 222 Ill. 2d at 353, 856 N.E.2d at 356, that although the defendant had “prove[d] a due[-] process violation which amounted to error by showing that he was required to wear an electronic stun belt at trial without the court having first determined that it was necessary,” the defendant had failed to establish “ ‘that the error was so serious that it affected the fairness of [his] trial and challenged the integrity of the judicial process’ ” (i.e., the second of the two alternative ways of establishing plain error, as described by Herron). Allen, 222 Ill. 2d at 353, 856 N.E.2d at 356. The supreme court added: “Here, [the] defendant cannot, and does not, claim that the evidence presented was closely balanced” (referring to the other way of establishing plain error). Allen, 222 Ill. 2d at 353, 856 N.E.2d at 357. Likewise, in the appeal before us, the majority declares that “the evidence in [respondent’s] case was not closely balanced.” 386 Ill. App. 3d at 746. The majority reasons as follows: “Respondent was charged with criminal sexual assault and attempted robbery. Although the testimony regarding the criminal sexual assault came down to a credibility determination between respondent and C.H., the evidence presented as a whole was not so close as to warrant application of the plain-error doctrine. During his testimony, respondent essentially admitted his part in the attempted robbery, acknowledging that he and G.W agreed to take money from C.H. and that he restrained C.H. while G.W. searched her for money. He made similar admissions in his first statements to police. Further, as discussed, respondent’s version of the events surrounding the criminal-sexual-assault charge contained many inconsistencies.” 386 Ill. App. 3d at 746. Thus, even though “the criminal sexual assault came down to a credibility determination between respondent and C.H.” (386 Ill. App. 3d at 746), the majority did not find the evidence to be closely balanced, because (1) respondent admitted he attempted to rob C.H. and (2) his version of what happened “contained many inconsistencies’ ’ (386 Ill. App. 3d at 746). As for the first reason, respondent’s attempting to rob C.H. did not prove he sexually assaulted her. His attempting to rob her could prove, however, that she had sold sex to the two boys and they wanted their money back. A deputy sheriff, Andrew Good, testified that sometime around 1:15 a.m. on July 11, 2006, he was on patrol when he heard people screaming on Campbell Street. As he approached, he saw two males standing over a female. While striking her with their hands, the males were screaming at her, “Give me the money[!]” and “Where is the bread[?]” In his own testimony, respondent corroborated that is precisely what his companion, G.W, said to C.H.: “Where is the money? Where is the bread?” Note the repetition of the definite article in both Good’s and respondent’s testimony: the money and the bread. In their confrontation with C.H., the two boys were referring not to money in general but to a specific res — namely, the cash they testified they had paid C.H. for her sexual services, or so a trier of fact could reasonably infer. The second reason the majority gives for finding the evidence not to be closely balanced is just as unconvincing as the first. The majority says that respondent’s testimony “contained many inconsistencies.” 386 Ill. App. 3d at 746. That is true, but in the majority’s assessment of the evidence, the inconsistencies in C.H.’s testimony and statements apparently do not count. I will not go so far as to say that the evidence is insufficient, as a matter of law, to sustain the conviction of criminal sexual assault, but C.H.’s credibility could fairly be questioned. She contradicted herself repeatedly, and her testimony was irreconcilable with certain physical realities of the crime scene. To fasten on the inconsistencies in respondent’s testimony and ignore the problems in C.H.’s testimony does not constitute an imbalance in the testimony, but only a determination that under our standard of review, we cannot second-guess the credibility determinations of the trier of fact. We cannot decide whether the evidence was closely balanced without objectively weighing the evidence on both sides. Given respondent’s testimony that C.H. approached him on the street around midnight on July 11, 2006, and offered to have sex with him for payment, one naturally would be interested in knowing where C.H. was going at that hour and where she had been. This is not to suggest that anyone strolling the streets at midnight should be suspected of prostitution, but respondent alleged that C.H. approached him and after offering to sell him a television, offered to “do anything” for money; therefore, one might have expected the State to counter his allegation with credible and definite corroborating evidence that C.H. was, to the contrary, out on some legitimate errand. Such evidence was not forthcoming, and C.H.’s statements were inconsistent on this question. C.H. told a police officer, Curt Apperson, that she was on her way home from visiting a friend named Antoine when the two boys sexually assaulted her. Later, at the hospital, she told Apperson a different story: that she had been to the house of a friend named Donnie. She told another police officer, William Davis, that she had gone to Antoine’s house, and she never mentioned Donnie to him. The State called neither Antoine nor Donnie. Apparently, Donnie’s last name is Stewart. The record does not seem to reveal Antoine’s last name. A registered nurse, Mary Sexton, treated C.H. at the hospital, and according to Sexton’s notes, C.H. told her the attackers had a small black-handled pistol. Because Sexton failed to note down some of the abrasions C.H. had suffered (as shown in photographs admitted in evidence) and because Sexton came across to the trial court as a “glum” or reluctant witness, the court did not find her to be credible. But if one considers Sexton to be an unreliable witness, it seems one would have to consider Good to be unreliable, too, for he testified that when he approached C.H. and the assailants fled, C.H. ran to him and said she had been raped and that “they had a gun.” C.H. never mentioned a gun in her testimony at trial. That her assailants were armed with a pistol would have been an important fact under any view, and the omission of that fact from her testimony is troubling and inexplicable. Typically, falsehood reveals itself in the incidental factual representations. A lie becomes more difficult to sustain as the details accumulate. (I am not asserting that C.H. lied. That is not for us to decide. I am merely trying, as fairly as possible, to take account of the evidence on the other side.) C.H. testified that as she was walking down the sidewalk, on her way home from visiting a friend’s house, respondent, whom she described as the taller boy, and G.W., whom she described as the shorter boy, asked her if she would like to go behind a house and have a drink. Apparently, the house was where respondent’s cousin, Destiny Nesbitt, lived. According to C.H.’s testimony, she paused a moment on the sidewalk, and respondent, the taller boy, was idly pressing a button, causing a garage door to go up and down. C.H. testified she declined G.W.’s offer, whereupon GW. grabbed her and pulled her behind the house and the two boys sexually assaulted her. According to respondent’s testimony, C.H. voluntarily went behind his cousin’s house pursuant to her agreement with him and G.W. to have sex with them for $20 apiece. As it turned out, Nesbitt did indeed have a garage adjoining her duplex, but the evidence was unrebutted that the garage had a manual door with no automatic garage-door opener or electric button. The trial court stated: “There would be no reason for C.H. to make that up, and it may well have been a [misjperception. I don’t think anyone is paying careful attention to the mechanism that operates a garage door when the events are on the discussion and what took place.” I do not think that all reasonable minds would necessarily be satisfied by this rationalization. It is difficult to understand how C.H. could have misperceived what respondent was doing — she thought she saw him pressing a button, but actually he grasped the handle of the garage door and physically lifted the door and lowered it over and over again? Setting aside the question of why anyone would feel inclined to do that, the physical actions are so different from one another as to make a mistake unlikely. A rational trier of fact could find — would not have to find, but could find — that C.H. made up the electric garage-door opener and made up the black-handled gun and made up the midnight trip to the friend’s house and, therefore, made up the sexual assault. In summary, with respect to the charge of criminal sexual assault, this case turned on credibility, as the majority admits — C.H.’s testimony on the one hand and respondent’s testimony on the other— and respondent was not the only witness whose narrative was plagued by discrepancies, contradictions, and improbabilities. One could question C.H.’s credibility, too. Therefore, contrary to the majority’s assessment, the evidence was closely balanced. The majority refuses to apply the plain-error doctrine to this case because the evidence on the other count, attempt (robbery), was not closely balanced. Apparently, in the majority’s view, if a defendant were charged with one count of first-degree murder and one count of misdemeanor theft and the evidence were closely balanced on the former count but not on the latter count, review under the doctrine of plain error would be unavailable: it would not matter that because the evidence of murder was closely balanced, an error might have caused the defendant to be wrongly convicted of that offense — because the evidence that he committed misdemeanor theft was overwhelming. That approach to plain error cannot logically be sustained. “When there is error in a close case, we choose to err on the side of fairness, so as not to convict an innocent person.” Herron, 215 Ill. 2d at 193, 830 N.E.2d at 483. Failing to hold a Boose hearing was error. See Allen, 222 Ill. 2d at 353, 856 N.E.2d at 356. For 137 years, courts in this country have recognized that shackles can function as a psychological weapon against the accused. In the first American shackling case, the Supreme Court of California stated: “A prisoner upon his trial in [cjourt is in the custody of the law[ ] and under the immediate control of and subject to the orders of such [cjourt. *** [AJny order or action of the [cjourt which, without evident necessity, imposes physical burdens, pains and restraints upon a prisoner during the progress of his trial, inevitably tends to confuse and embarrass his mental faculties, and thereby materially to abridge and prejudicially affect his constitutional rights of defense; and especially would such physical bonds and restraints in like manner materially impair and prejudicially affect his statutory privilege of becoming a competent witness and testifying in his own behalf.” People v. Harrington, 42 Cal. 165, 168 (1871). Likewise, the Supreme Court of Missouri has stated: “[TJhe condition of the prisoner in shackles may, to some extent, deprive him of the free and calm use of all his faculties.” State v. Kring, 64 Mo. 591, 593 (1877); see also Williams v. State, 629 P.2d 54, 58 n.7 (Alaska 1981); State v. Roberts, 86 N.J. Super. 159, 164, 206 A.2d 200, 203 (1965). It may be that, physically, restraints are not as painful now as they were a hundred or more years ago (Deck v. Missouri, 544 U.S. 622, 630, 161 L. Ed. 2d 953, 963, 125 S. Ct. 2007, 2012-13 (2005); Kennedy v. Card-well, 487 F.2d 101, 106 (6th Cir. 1973)), but I am unconvinced that the cases were concerned merely with physical pain. They were concerned with the diminution of the accused’s self-respect before the tribunal to which he must make his defense. Courts considered it an abhorrent practice to “ ‘ “[bring the defendant] to the [bjar in a contumelious [mjanner,” ’ ” bearing, on his hands or feet, the “ ‘ “[mjark of [ijgnominy and [rjeproach.” ’ ” Deck, 544 U.S. at 630, 161 L. Ed. 2d at 963, 125 S. Ct. at 2013, quoting Roberts, 86 N.J. Super, at 162, 206 A.2d at 202, quoting 2 W. Hawkins, Pleas of the Crown, ch. 28, §1, at 308 (1716-1721) (section on arraignments). Even in a bench trial, a defendant should not be shackled unless the trial court has good cause to believe that shackles are necessary to keep the courtroom safe or to prevent escape; for unnecessary shackling threatens the dignity of the court. Staley, 67 Ill. 2d at 37, 364 N.E.2d at 73. As a court loses its dignity, it loses credibility with the public (Deck, 544 U.S. at 631, 161 L. Ed. 2d at 964, 125 S. Ct. at 2013); and I further would argue that it loses credibility with the respondent — to the possible detriment of his defense. To do his best at trial, the defendant must have confidence that he is making his case to a rational and impartial trier of fact who genuinely presumes he is innocent until the State proves him to be guilty beyond a reasonable doubt. Unnecessary and unjustified shackling weakens that confidence; it “jeopardizes the presumption’s value and protection.” Staley, 67 Ill. 2d at 37, 364 N.E.2d at 73. The presumption of innocence is a noble ideal, but this ideal will inspire little hope if hard iron reminds the defendant, every moment of the trial, how things really are between him and the court — for, plainly, he is not “standing] trial ‘with the appearance, dignity, and self-respect of a free and innocent man.’ ” Staley, 67 Ill. 2d at 37, 364 N.E.2d at 73, quoting Eaddy v. People, 115 Colo. 488, 492, 174 P.2d 717, 719 (1946). In addition to defending himself against the State’s evidence, a defendant should not have to struggle with a sense of futility, a disheartening suspicion that he is presumed guilty. Anyone who can sit in chains with no diminution of courage and confidence has a thicker hide than the common run of humanity. I would find the failure to hold a Boose hearing to be plain error because the evidence was closely balanced. I would reverse the trial court’s judgment and remand this case for a new trial — to be conducted without shackles, unless the trial court holds a Boose hearing and finds a clear need for them. B. Denial of a Jury Trial 1. The Inapplicability of Fucini, Presley, and G.O. In rejecting respondent’s argument that denying him a jury trial violated due process, the majority begins by citing three cases— Fucini, Presley, and G.O. — all of which are distinguishable because they do not address the specific arguments respondent is making in this appeal. It is true, as the majority says, that in Fucini, 44 Ill. 2d at 310, 255 N.E.2d at 382, and Presley, 47 Ill. 2d at 55, 264 N.E.2d at 179 (which simply referenced Fucini), the supreme court “held that juveniles have no right to a jury trial under the Illinois Constitution.” 386 Ill. App. 3d at 747. But the supreme court decided Fucini and Presley in 1970, and much has changed in the intervening 38 years. The Juvenile Court Act no longer exists. We now have the Juvenile Court Act of 1987, which, in 1999, was amended so as to effect “a fundamental shift from the singular goal of rehabilitation to include overriding concerns of protecting the public and holding juvenile offenders accountable for violations of the law” (Taylor, 221 Ill. 2d at 167, 850 N.E.2d at 139). Also, when the supreme court decided Fucini and Presley, there was no Sex Offender Registration Act (730 ILCS 150/1 through 12 (West 2006)). As for G.O., it is true, as the majority says, that the supreme court in that case “rejected arguments that the denial of a jury trial to a juvenile charged with first-degree murder violated equal protection or due process.” 386 Ill. App. 3d at 747. But, again, this discussion of G.O. is so general as to be misleading. One must bear in mind the argument the respondent was making in that case. He argued that denying him a jury trial violated due process because the mandatory minimum sentence required by section 5 — 33(1.5) of the Act (705 ILCS 405/5 — 33(1.5) (West 1996)) — i.e., “committment] to the Department of Corrections, Juvenile Division, until his ‘21st birthday, without the possibility of parole, furlough, or non[ ]emergency authorized absence for a period of 5 years’ ” (G.O., 191 Ill. 2d at 40-41, 727 N.E.2d at 1005) — “render[ed] the process to which [he was] subject much more punitive than rehabilitative.” G.O., 191 Ill. 2d at 44, 727 N.E.2d at 1007. The supreme court rejected respondent’s due-process theory in G.O. for the sole reason that the theory rested on a false premise, namely, that there was such a statute as section 5 — 33(1.5). Actually, that section of the Act was void ab initio because it was part of Public Act 88 — 680 (Pub. Act 88 — 680, §5 — 15, eff. January 1, 1995 (1994 Ill. Laws 2750)), which, in People v. Cervantes, 189 Ill. 2d 80, 98, 723 N.E.2d 265, 274 (1999), the supreme court held to be unconstitutional because the General Assembly had violated the single-subject clause (Ill. Const. 1970, art. IV §8(d)). G.O., 191 Ill. 2d at 43-44, 727 N.E.2d at 1007. The respondent in G.O. gave the supreme court “no other reason to reexamine [its] earlier decisions” such as Fucini. G.O., 191 Ill. 2d at 44, 727 N.E.2d at 1007. Significantly, the majority in G.O. stated: “Contrary to Justice Heiple’s assertions [in his dissent], we do not hold that a due[-]process argument is foreclosed by Fucini. Instead, we hold that, in the absence of the mandatory sentencing provision, [the] respondent does not ask this court to reconsider Fucini. The argument considered by Justice Heiple is not before this court[,] and we express no opinion [on] its merits.” G.O., 191 Ill. 2d at 44 n.3, 727 N.E.2d at 1007 n.3. In this appeal, respondent relies heavily on Justice Heiple’s dissent in G.O. and repeats his arguments. It is true that Justice Heiple’s dissent is not precedential, but the majority in this case goes further and concludes that Fucini, Presley, and G.O. dispose of Justice Heiple’s arguments (which also are respondent’s arguments) when, in fact, the majority in G.O. emphasized it was expressing no opinion, one way or the other, on the merits of Justice Heiple’s arguments and disavowed any implication that Fucini foreclosed a due-process challenge along the lines of his dissent. Thus, the three cases on which the majority chiefly relies in disposing of respondent’s due-process theory (Fucini, Presley, and G.O.) really pose no obstacle at all to that theory. Fucini and Presley were decided under a statute that no longer exists, and G.O. rejected a due-process challenge for a narrow reason that has no relevance to this case. 2. Due Process Versus the “Wooden Approach” The majority concludes that respondent’s due-process challenge must fail because despite the 1999 amendments to the Act, proceedings under the Act still are not criminal (A.G., 195 Ill. 2d at 317, 746 N.E.2d at 735; Taylor, 221 Ill. 2d at 168, 850 N.E.2d at 140) and “rehabilitation remains a more important consideration in the juvenile justice system than in the criminal justice system” (Taylor, 221 Ill. 2d at 170, 850 N.E.2d at 141). As long as there is a juvenile justice system with less severe maximum sentences than in the criminal justice system, one never will be able to characterize delinquency proceedings — absolutely and unreservedly — as “criminal”; rehabilitation always will be a somewhat greater consideration in juvenile delinquency proceedings than in criminal proceedings. Labels should not determine our disposition of respondent’s appeal. The Supreme Court has said: “Little, indeed, is to be gained by any attempt simplistically to call the juvenile court proceeding either ‘civil’ or ‘criminal.’ The Court carefully has avoided this wooden approach.” McKeiver, 403 U.S. at 541, 29 L. Ed. 2d at 658, 91 S. Ct. at 1984. Delinquency proceedings are on a continuum between civil and criminal — they partake of aspects of each — and instead of asking whether delinquency proceedings are one or the other, we should be asking whether, in respondent’s case, the proceedings were close enough, in their objectives, to the criminal end of the continuum (and far enough away from the State’s traditional paternalistic role) as to make it a violation of due process, or fundamentally unfair, to deny him a trial by jury. I derive the standard of fundamental fairness from McKeiver, a plurality decision by the Supreme Court. A majority of the Court agreed in that case that trial by jury in a juvenile court’s adjudicative stage was not constitutionally required. McKeiver, 403 U.S. at 545, 29 L. Ed. 2d at 661, 91 S. Ct. at 1986. Justice Blackmun wrote an opinion listing 13 reasons for that holding. McKeiver, 403 U.S. at 545-51, 29 L. Ed. 2d at 661-64, 91 S. Ct. at 1986-89. Only three other members of the Court — Chief Justice Burger, Justice Stewart, and Justice White— joined in Justice Blackmun’s opinion. Justice Harlan concurred in the judgments for the sole reason that, in his view, “criminal jury trials [were] not constitutionally required of the [s]tates, either as a matter of [s]ixth[-][a]mendment law or due process.” McKeiver, 403 U.S. at 557, 29 L. Ed. 2d at 668, 91 S. Ct. at 1992 (Harlan, J., concurring). No other members of the court shared that view. Justice Brennan concurred in the judgment in the Pennsylvania cases but dissented in the North Carolina cases (two groups of cases, one group from Pennsylvania and the other from North Carolina, were before the Court). In his opinion, he did not say he agreed with Justice Black-mun’s 13 reasons, but on one point he did explicitly agree with Justice Blackmun’s rationale: that due process required “ ‘fundamental fairness *** [in] factfinding.’ ” McKeiver, 403 U.S. at 554, 29 L. Ed. 2d at 666, 91 S. Ct. at 1990 (Brennan, J., concurring in part and dissenting in part). In both Justice Blackmun’s opinion and Justice Brennan’s opinion (and, therefore, in the view of a majority of the Supreme Court), the fundamental fairness of denying a jury trial in juvenile delinquency proceedings depended largely on the paternalistic and beneficent character of such proceedings. Justice Blackmun was concerned that requiring a jury trial would “remake the juvenile proceeding into a fully adversary process and [would] put an effective end to what has been the idealistic prospect of an intimate, informal protective proceeding.” McKeiver, 403 U.S. at 545, 29 L. Ed. 2d at 661, 91 S. Ct. at 1986; see also Fucini, 44 Ill. 2d at 309, 255 N.E.2d at 382. Justice Brennan reasoned as follows: “The availability of trial by jury allows an accused to protect himself against possible oppression by what is in essence an appeal to the community conscience, as embodied in the jury that hears his case. To some extent, however, a similar protection may be obtained when an accused may in essence appeal to the community at large, by focusing public attention upon the facts of his trial, exposing improper judicial behavior to public view, and obtaining, if necessary, executive redress through the medium of public indignation. Of course, the Constitution, in the context of adult criminal trials, has rejected the notion that public trial is an adequate substitution for trial by jury in serious cases. But in the context of juvenile delinquency proceedings, I cannot say that it is beyond the competence of a [s]tate to conclude that juveniles who fear that delinquency proceedings will mask judicial oppression may obtain adequate protection by focusing community attention upon the trial of their cases. For, however much the juvenile system may have failed in practice, its very existence as an ostensibly beneficent and noncriminal process for the care and guidance of young persons demonstrates the existence of the community’s sympathy and concern for the young. Juveniles able to bring the community’s attention to bear upon their trials may therefore draw upon a reservoir of public concern unavailable to the adult criminal defendant.” McKeiver, 403 U.S. at 554-55, 29 L. Ed. 2d at 666, 91 S. Ct. at 1991 (Brennan, J., concurring in part and dissenting in part). Justice Brennan dissented in the North Carolina cases because North Carolina law either permitted or required the exclusion of the general public from juvenile trials. McKeiver, 403 U.S. at 556, 29 L. Ed. 2d at 667, 91 S. Ct. at 1991 (Brennan, J., concurring in part and dissenting in part). Section 1 — 5(6) of the Act provides: “The general public except for the news media and the crime victim *** shall be excluded from any hearing and, except for the persons specified in this [s]ection[,] only persons, including representatives of agencies and associations, who in the opinion of the court have a direct interest in the case or in the work of the court shall be admitted to the hearing.” 705 ILCS 405/1— 5(6) (West 2006). Because the general public is excluded from hearings under the Act and we have held that a trial court, in its discretion, also may exclude the news media (In re a Minor, 205 Ill. App. 3d 480, 491, 563 N.E.2d 1069, 1076 (1990)), public scrutiny of the trial court’s decision in a juvenile delinquency case cannot substitute for a jury trial. Respondent was not able to “draw upon a reservoir of public concern.” See McKeiver, 403 U.S. at 555, 29 L. Ed. 2d at 666, 91 S. Ct. at 1991 (Brennan, J., concurring in part and dissenting in part). Further, with the 1999 amendments to the Act and the necessity of respondent’s having to register as a sex offender as a result of the adjudication of delinquency, it is unclear that “concern,” “sympathy,” and “paternal attention” were the uppermost values in the proceeding. McKeiver, 403 U.S. at 550, 29 L. Ed. 2d at 664, 91 S. Ct. at 1989. As applied to respondent, the process was not “ostensibly beneficent.” McKeiver, 403 U.S. at 555, 29 L. Ed. 2d at 666, 91 S. Ct. at 1991 (Brennan, J., concurring in part and dissenting in part). In Taylor, 221 Ill. 2d at 165-66, 850 N.E.2d at 138-39, the supreme court gave an overview of the 1999 amendments to the Act: “The *** Act was radically altered ***. The General Assembly amended the Act with Public Act 90 — 590, effective January 1, 1999. 705 ILCS Ann. 405/5 — 101 et seq. (Smith-Hurd 1999). The amendatory changes renumbered the sections and largely rewrote article V of the Act to provide more accountability for the criminal acts of juveniles and, from all appearances, to make the juvenile delinquency adjudicatory process look more criminal in nature. Compare 705 ILCS 405/5 — 1 et seq. (West 1996) with 705 ILCS 405/ 5 — 105 et seq. (West 2000). For starters, the 1999 amendments provided a new purpose and policy section, which states in relevant part as follows: ‘(1) It is the intent of the General Assembly to promote a juvenile justice system capable of dealing with the problem of juvenile delinquency, a system that will protect the community, impose accountability for violations of law[,] and equip juvenile offenders with competencies to live responsibly and productively. To effectuate this intent, the General Assembly declares the following to be important purposes of this [ajrticle: (a) To protect citizens from juvenile crime. (b) To hold each juvenile offender directly accountable for his or her acts. (c) To provide an individualized assessment of each alleged and adjudicated delinquent juvenile, in order to rehabilitate and to prevent further delinquent behavior through the development of competency in the juvenile offender. As used in this [sjection, “competency” means the development of educational, vocational, social, emotional[,] and basic life skills which enable a minor to mature into a productive member of society. (d) To provide due process, as required by the Constitution of the United States and the State of Illinois, through which each juvenile offender and all other interested parties are assured fair hearings at which legal rights are recognized and enforced. (2) To accomplish these goals, juvenile justice policies developed pursuant to this [a]rticle shall be designed to: Ob) Provide secure confinement for minors who present a danger to the community and make those minors understand that sanctions for serious crimes, particularly violent felonies, should be commensurate with the seriousness of the offense and merit strong punishment; (c) Protect the community from crimes committed by minors; * * * (j) Hold minors accountable for their unlawful behavior and not allow minors to think that their delinquent acts have no consequence for themselves and others.’ 705 ILCS 405/5— 101 (West 2000). Although proceedings under the Act are still not criminal in nature even in the aftermath of the 1999 amendments and are to be administered in a spirit of humane concern for the minor and to promote his general welfare, the policy statement in section 5 — 101 represents a fundamental shift from the singular goal of rehabilitation to include the overriding concerns of protecting the public and holding juvenile offenders accountable for violations of the law. [Citation.] Consistent with this end, the 1999 amendments changed some of the terminology of the Act. The Act now provides for a number of features common to a criminal trial. Pertinent to our analysis are the following provisions. The legislature has now indicated an intent that the term ‘ “trial” replace the term “adjudicatory hearing” and be synonymous with that definition as it was used in the [Act].’ 705 ILCS 405/5 — 101(17) (West 1998). Furthermore, the Act now allows for a ‘plea of guilty’ in a delinquency proceeding (705 ILCS 405/5 — 605 (West 1998)), and if a trial is conducted, the court is required, at its conclusion, to ‘make and note in the minutes of the proceeding a finding of .whether or not the minor is guilty.’ (Emphasis added.) 705 ILCS 405/5 — 620 (West 1998). If the court finds the minor ‘guilty,’ the cause then proceeds to a ‘sentencing hearing,’ where it is determined whether or not it is in the best interests of the minor or the public that he be made a ward of the court, with the possibility that if defendant is adjudicated a ward of the court, he could be committed to the Department of Corrections, Juvenile Division. 705 ILCS 405/5 — 620, 5 — 705, 5 — 710 (West 1998). In sum, the Act now provides for pleas of guilty, findings of guilty[,] and sentencing Not only was respondent “tried” under an Act that, since the 1999 amendments, put an increased emphasis on punishment and, as the supreme court said, “look[ed] more criminal in nature,” but his commitment to the Juvenile Division of the Department of Corrections until his twenty-first birthday (an approximate five-year sentence) translates to an even longer sentence when one recognizes that adult offenders earn good-time credits for time served and programs completed. Moreover, the finding of “guilty” of the offense of criminal sexual assault (720 ILCS 5/12 — 13(a)(1) (West 2004)) resulted in a designation of “sexual predator” within the meaning of section 2(E)(1) (730 ILCS 150/2(E)(1) (West 2004)), requiring respondent to begin registering as a sex offender when he turned 17 (730 ILCS 150/3(a) (West 2004)) and to continue registering for the rest of his life (730 ILCS 150/7 (West 2004)). The State was not acting as a compassionate and sympathetic “parent” when it imposed that requirement on him. Society holds sex offenders in deep abhorrence. See M. Earl-Hubbard, The Child Sex Offender Registration Laws: The Punishment, Liberty Deprivation, and Unintended Results Associated With the Scarlet Letter Laws of the 1990s, 90 Nw. U. L. Rev. 788, 824 (1996) (“Authorities have documented numerous instances of vigilantism and attacks on registered offenders in the few years the registration laws have been in effect”); R. Tewksbury, Conversation: Residency Restrictions on Sex Offenders: Exile at Home: The Unintended Collateral Consequences of Sex Offender Residency Restrictions, 42 Harv. C.R.-C.L. L. Rev. 531, 534-35 (2007) (loss or denial of employment, decrease in social interaction, and difficulty finding housing). Being registered as a sex offender is like having the mark of Cain, and it is a mark that respondent will bear to his grave. He will be “forever kept under the shadow of his crime, forever kept within voice and view of the criminal magistrate, not being able to change his domicile without giving notice to the ‘authority immediately in charge of his surveillance’ ***. He may not seek, even in other scenes and among other people, to retrieve his fall from rectitude. Even that hope is taken from him, and he is subject to tormenting regulations that, if not so tangible as iron bars and stone walls, oppress as much by their continuity ***.” Weems v. United States, 217 U.S. 349, 366, 54 L. Ed. 793, 798, 30 S. Ct. 544, 549 (1910). Considering what was at stake in this juvenile delinquency proceeding, fundamental fairness required that respondent have a right to a jury trial, and I would reverse the trial court’s judgment and remand this case with directions to afford him that right.